## KNOX *v.* THE STATE.

[No. 20,467.   Filed February 14, 1905.]

1. EXTRADITION.—*Interstate.—Right to Try for Different Crime.*— A fugitive from justice, rendited from another State, may lawfully be tried upon a different charge than the one for which he was rendited, without giving such fugitive a chance to return to his asylum state. p. 229.

2. SAME.—*Right of.*—The right of one nation to demand and receive from another nation a fugitive from justice depends upon treaty stipulations and is measured thereby.   p. 230.

3. SAME.—*Right of Asylum.—Whether Inheres to the Person.*—The right of asylum is not a natural or inherent right of the person, but is based upon the right of the sovereign to afford an asylum to the fugitive in his territorial jurisdiction.   p. 231.

4. SAME.—*Interstate Rendition.*—The principles governing international extradition do not apply to interstate rendition.   p. 232.

5. CONSTITUTIONAL LAW.—*Interstate Rendition.*—The trial of a fugitive from justice by the state in which the crime was committed, upon a different charge than the one on which such fugitive was rendited, is not in violation of the Constitution of the United States.   p. 232.

6. EXTRADITION.—*Interstate Rendition.—Trial Upon Different Charge.* —Where a fugitive is placed upon trial for an offense the facts of which are the same or substantially the same as of the crime for which he was rendited, defendant can not complain, though the offenses are technically different.   p. 235.

7. INDICTMENT AND INFORMATION.—*Counts.—Sufficiency.—Harmless Error.*—Where the defendant is acquitted on certain counts in an information, error of the court in refusal to quash is harmless. p. 235.

8. SAME.—*Counts in Information.—Legality.*—An information may consist of different counts.   p. 235.

9. SAME.—*Counts.—Election.*—A motion to require the state to elect on which count it intends to try is addressed to the sound discretion of the court, and such discretion, unless abused, will not be reviewed and reversed, and where it appears that the several counts were based upon the same essential facts, the doctrine of election does not apply. p. 235.

10. EVIDENCE.—*Alteration of Check.—Conspiracy.—Declaration of Co-Conspirator in Absence of Defendant.*—The declarations of a co-conspirator at the time of his attempted negotiation of a forged check, though in the absence of the defendant, are admissible against defendant.   p. 236.

11. SAME.—*Letter Found on Co-Conspirator.*—A letter, purporting to be from defendant and containing admissions, found on a co-conspirator, is competent evidence against such defendant as a physical fact of an incriminating character, and is also competent when identified by such co-conspirator as having been received from defendant. p. 237.

12. APPEAL AND ERROR.—*Weighing Evidence.—Criminal Case.*—The Supreme Court is not authorized to weigh the evidence on appeal in a criminal case by virtue of the act of 1903, Acts 1903, p. 338, §8. p. 237.

From Jay Circuit Court; *Edwin C. Vaughn,* Special Judge.

Prosecution by the State of Indiana against Robert J. Knox. From a judgment of conviction, defendant appeals. *Affirmed.*

*Emerson E. McGriff,* for appellant.

*Charles W. Miller,* Attorney-General, *C. C. Hadley, L. G. Rothschild* and *W. C. Geake,* for the State.

MONTGOMERY, J.—A criminal action was commenced against appellant and one H. B. Gordon, whose true name was alleged to be unknown, by filing an affidavit with a justice of the peace of Jay county, charging, in substance, that said defendants at said county on the 2d day of March, 1904, feloniously conspired and agreed feloniously to deface and alter a certain check for the payment of money, which check before such alteration was as follows: "Cashiers check. Lewisburg, W. Va., Jan. 27, 1904. 190—, No. 1079. The Bank of Greenbrier. Pay to the order of H. B. Gordon $15.00, Fifteen 00/100 Dollars, H. F. Hunter, Ass't Cashier. For ———." And the affidavit charged the manner of the alteration and set out a copy of the check altered calling for $1,500, and the alteration was made to defraud the Citizens Bank, etc. Upon this charge, on appli-

cation of the State, a requisition was issued by the Governor of this State upon the governor of Ohio for the return of appellant to Jay county for trial. Appellant was arrested at Columbus, Ohio, and duly returned, and confined in the jail of the county to answer said charge. On March 22, 1904, while appellant was so confined in jail, this action was instituted by the filing of an affidavit and information in five counts in the office of the clerk of the Jay Circuit Court, and the issuance of a warrant thereon for the arrest of appellant and said Gordon.

The first count of the affidavit and information charged defendants with the forgery of the following check: "Cashiers check. Lewisburg, W. Va., Jan. 27, 1904. No. 1079. The Bank of Greenbrier. Pay to the order of H. B. Gordon $1,500, Fifteen Hundred 00/100 Dollars. H. F. Hunter, Ass't Cashier. For ——————————," and that the forgery was committed to defraud the Bank of Greenbrier. The second count charged defendants with uttering and publishing as true the above false and forged check, with intent to defraud the Citizens Bank of Portland. The third count charged defendants with conspiracy to make and forge said check, with intent to defraud the Bank of Greenbrier. The fourth count charged defendants with a conspiracy to utter and publish as true said false and forged check, with intent to defraud the Citizens Bank of Portland. The fifth count charged the same offense as the fourth, but set out in detail the alterations made in the check, and a copy of the check before as well as after such alterations were made.

Appellant, being rearrested on said warrant, appeared by counsel "specially" to said affidavit and information, and filed a plea in abatement thereto. This plea set forth with particularity the first charge preferred against him before the justice, his arrest, and extradition from the state of Ohio to answer said charge and no other; the filing of another affidavit and an information thereon charging him with a different offense from that for which he was extra-

dited, while the first was undisposed of and before he had been afforded an opportunity to return to Ohio, "his asylum state." A demurrer to this plea, for want of facts, was sustained, and appellant excepted. Appellant's motion to quash each count of the affidavit and information was overruled, and an exception saved. At his request, appellant was tried separately, and upon the conclusion of the State's evidence he moved the court to require the State to elect upon which count it relied for a conviction, and this motion was overruled, and an exception saved to the ruling. Upon the conclusion of the evidence the court withdrew from the consideration of the jury the first, third and fifth counts of the affidavit and information, and the jury, after deliberation, returned a verdict of guilty upon the fourth count. Appellant applied for a new trial, his motion was overruled, and an exception properly saved, and judgment pronounced upon the verdict.

The assignment of errors charges: (1) That the affidavit and information, and each count thereof, does not state facts sufficient to constitute a public offense; (2) error in overruling appellant's motion to quash each count of the affidavit and information; (3) error in sustaining appellee's demurrer to the plea in abatement; (4) error in overruling the motion to require the State to elect upon which count it would rely for conviction; (5) error in overruling the motion for a new trial; (6) that the judgment is not fairly supported by the evidence; and (7) that the decision of the court is not fairly supported by the evidence.

1. The first question for our consideration, in logical order, is raised by the demurrer to appellant's plea in abatement, and is this: Can a fugitive from justice fleeing from this State into another state, when lawfully extradited and returned to this State to answer a specific crime, be required to answer another and different criminal charge under our laws, before being afforded an opportunity to return to the state from which he has been extradited? Ap-

pellant contends that this question must be answered in the negative, and cites in support of his contention a number of authorities, among which are the following: *State* v. *Mc-Naspy* (1897), 58 Kan. 691, 50 Pac. 895, 38 L. R. A. 756; *Ex parte McKnight* (1891), 48 Ohio St. 588, 28 N. E. 1034, 14 L. R. A. 128; *State* v. *Jackson* (1888), 36 Fed. 258, 1 L. R. A. 370; *State* v. *Hall* (1888), 40 Kan. 338, 19 Pac. 918, 10 Am. St. 200; *United States* v. *Watts* (1882), 8 Saw. 370, 14 Fed. 130; *Ex parte Hibbs* (1886), 26 Fed. 421; *Ex parte Coy* (1887), 32 Fed. 911; *Commonwealth* v. *Hawes* (1878), 13 Bush (Ky.) 697, 26 Am. Rep. 242; *Blandford* v. *State* (1881), 10 Tex. App. 627; *United States* v. *Rauscher* (1886), 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425.

The cases cited above from the states of Kansas, Ohio and Tennessee support the doctrine contended for by appellant. The other cases cited involve only international, and not interstate, extradition. Appellant contends, however, that the principles governing international extradition are equally controlling in cases of interstate extradition, and the courts of Kansas, Ohio and Tennessee declare that doctrine in the cases cited above.

2. The right of one independent government to demand and receive from another the custody of an offender who has sought an asylum upon its soil, depends upon the existence of treaty stipulations between them, and is measured and restricted by the express terms and provisions of the treaty, and those silent provisions which are necessarily implied.

In the case of the *United States* v. *Rauscher, supra,* the court, by Mr. Justice Miller, said: "It is only in modern times that the nations of the earth have imposed upon themselves the obligation of delivering up these fugitives from justice to the states where their crimes were committed, for trial and punishment. This has been done generally by treaties made by one independent government with another. Prior to these treaties, and apart from them, it may be stated

as a general result of the writers upon international law, that there was no well-defined obligation on one country to deliver up such fugitives to another, and though such delivery was often made, it was upon the principle of comity, and within the discretion of the government, whose action was invoked; and it has never been recognized as among those obligations of one government towards another which rest upon established principles of international law."

The crimes usually enumerated in such treaties, and for which extradition between nations is provided, are confined to such offenses as all mankind regard as heinous, and destructive of security of life and property; and all offenses of a political or religious character, and those growing out of intestine strife, are excluded. Applying the general rules for the construction of contracts to the interpretation of these treaties, it is plain that a nation could not demand, as a matter of right, the surrender of a fugitive from another independent government to answer for an offense not enumerated in an existing treaty between them, no matter how wicked such crime might seem. The extradition papers, therefore, must show with certainty, the particular offense with which the fugitive is charged, and on his return he can not be tried for any other offense until he has been afforded an opportunity to return to his asylum country. Any other rule would permit a prisoner to be extradited for an alleged crime of one class, and to be tried for another, which perhaps is not extraditable, and possibly merely political in character, and would result in a breach of that good faith and high honor which should characterize all dealings between nations.

3.    The right of the person extradited to return to the country from which he has been surrendered is not a natural and inherent right of his own, but is based upon the right of his adopted sovereign to afford asylum to the fugitive, and to refuse to give him up to another except upon such terms as it is pleased to impose. The criminal himself never

acquires a personal right of asylum or refuge anywhere, but all such rights as he may claim in this respect flow entirely out of the rights of the government to whose territory he has fled.

4.   In our opinion the principles governing international extradition have no application to cases of extradition between states of the Union.   This conclusion is in accord with the great weight of judicial authority, and rests upon sound principles and a wise public policy.

The second clause of §2 of article 4 of the Constitution of the United States declares that "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." To carry this constitutional provision into effect, congress passed the act of February 12, 1793, which has been in part reënacted and embodied in §§5278, 5279 R. S. U. S., which provide with regard to demanding the surrender of fugitives, that "it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear," and further, that the agent "so appointed who receives the fugitive into his custody, shall be empowered to transport him to the state or territory from which he has fled."

5.   A decision of the question under immediate discussion requires a construction of these provisions of the Constitution and statutes of the United States.   The Supreme Court of the United States has furnished a construction in the case of *Lascelles* v. *Georgia* (1893), 148 U. S. 537, 13 Sup. Ct. 687, 37 L. Ed. 549, and that construction and decision is binding upon us, and conclusively settles the controversy in this case.

Knox *v.* State.

Mr. Justice Jackson, speaking of the contention made in that case, and made by appellant in this—that a fugitive from one state extradited from another has the same rights of exemption as a fugitive from justice extradited from a foreign nation, says: "This proposition assumes, as is broadly claimed, that the states of the Union are independent governments, having the full prerogatives and powers of nations, except what have been conferred upon the general government; and not only have the right to grant, but do, in fact, afford to all persons within their boundaries an asylum as broad and secure as that which independent nations extend over their citizens and inhabitants. * * * If the premises on which this argument is based were sound, the conclusion might be correct. But the fallacy of the argument lies in the assumption that the states of the Union occupy towards each other, in respect to fugitives from justice, the relation of foreign nations, in the same sense in which the general government stands towards independent sovereignties on that subject; and in the further assumption that a fugitive from justice acquires in the state to which he may flee some state or personal right of protection, improperly called a right of asylum, which secures to him exemption from trial and punishment for a crime committed in another state, unless such crime is made the special object or ground of his rendition. * * * The sole object of the provision of the Constitution and the act of congress to carry it into effect, is to secure the surrender of persons accused of crime who have fled from the justice of a state whose laws they are charged with violating. Neither the Constitution, nor the act of congress providing for the rendition of fugitives upon proper requisition being made, confers, either expressly or by implication, any right or privilege upon such fugitives under and by virtue of which they can assert, in the state to which they are returned, exemption from trial for any criminal act done therein. No purpose or intention is manifested to afford them any immunity or protection

from trial and punishment for any offenses committed in the
state from which they flee. On the contrary, the provision
of both the Constitution and the statutes extends to all
crimes and offenses punishable by the laws of the state where
the act is done. *Commonwealth of Kentucky* v. *Dennison*
[1860], 24 How. 66, 101, 102;. *Ex parte Reggel* [1885],
114 U. S. 642 [5 Sup. Ct. 1148]." The opin-
ion is concluded in the following language: "It
would be a useless and idle procedure to require the
state having custody of the alleged criminal to
return him to the state by which he was rendered up in
order to go through the formality of again demanding his
extradition for the new or additional offenses on which it
desired to prosecute him. The Constitution and laws of the
United States impose no such condition or requirement
upon the state. Our conclusion is that, upon a fugitive's
surrender to the state demanding his return in pursuance of
national law, he may be tried in the state to which he is
returned for any other offense than that specified in the
requisition for his rendition, and that in so trying him
against his objection, no right, privilege, or immunity se-
cured to him by the Constitution and laws of the United
States is thereby denied." A like conclusion was reached
by the courts in the following cases: *Lascelles* v. *State*
(1891), 90 Ga. 347, 16 S. E. 945, 35 Am. St. 216; *Carr* v.
*State* (1893), 104 Ala. 43, 16 South. 155; *State* v. *Kealy*
(1893), 89 Iowa 94, 56 N. W. 283; *Commonwealth* v.
*Wright* (1892), 158 Mass. 149, 33 N. E. 82; *State* v. *Pat-
terson* (1893), 116 Mo. 505, 22 S. W. 696; *State, ex rel.,*
v. *Leidigh* (1896), 47 Neb. 126; *People, ex rel.,* v. *Cross*
(1892), 135 N. Y. 536, 32 N. E. 246, 31 Am. St. 850;
*State* v. *Glover* (1893), 112 N. C. 896, 17 S. E. 525; *Ham*
v. *State* (1878), 4 Tex. App. 645; *State, ex rel.,* v. *Stewart*
(1884), 60 Wis. 587, 19 N. W. 429, 50 Am. Rep. 388;
*Williams* v. *Weber* (1891), 1 Colo. App. 191, 28 Pac. 21;
*In re Brophy* (1895), 4 Ohio Dec. 391.

Our conclusion is that, upon his return to this State, appellant could be lawfully held to answer for any crime committed by him against the laws of this State, without regard to the particular offense named in the papers for his extradition, and, therefore, that there was no error in sustaining the State's demurrer to his plea in abatement.

6. If the offense for which appellant was extradited was based upon the same facts, and in its essential features was the same, as that for which he was tried, a question which we need not now determine, then appellant's contention could not be sustained, although the two offenses charged were technically different. *Musgrave* v. *State* (1893), 133 Ind. 297; *Waterman* v. *State* (1888), 116 Ind. 51; *Harland* v. *Territory of Washington* (1887), 3 Wash. Ter. 131, 13 Pac. 453; *Ex parte Foss* (1894), 102 Cal. 347, 36 Pac. 669, 25 L. R. A. 593, 41 Am. St. 182.

7. Appellant has made objection to the sufficiency of the first and second counts of the affidavit and information, but, as he was acquitted upon these counts, no harmful error can be predicated upon the court's ruling as to their sufficiency to charge a public offense.

8. Appellant insists that there is no statutory provision by which the State may prosecute a defendant upon more than one count by affidavit and information, and that the statute only provides for a prosecution upon different counts in cases founded upon an indictment. This question has been decided against appellant's contention in the case of *Diehl* v. *State* (1901), 157 Ind. 549. The verdict of guilty in this case was based upon the fourth count alone, and no objection to the sufficiency of this count has been pointed out or discussed in appellant's brief, and the first and second errors assigned will therefore be deemed waived.

9. A request to require the prosecuting attorney to elect upon which count of an indictment, or of an affidavit and information, he will rely for a conviction, is addressed largely to the discretion of the trial court, and this court will not

review and reverse its ruling upon such request unless it affirmatively appears that there was an abuse of such discretion. In this case it was manifest both from the affidavit and information, and also from the evidence when the motion was made, that the several counts of the charge against appellant were founded upon the same essential facts, and all arose from one transaction; the doctrine of election did not apply, and there was clearly no error in denying appellant's motion to require an election by the prosecuting attorney. *Reed* v. *State* (1897), 147 Ind. 41; *McCullough* v. *State* (1892), 132 Ind. 427; *Glover* v. *State* (1887), 109 Ind. 391; *Short* v. *State* (1878), 63 Ind. 376; *Mershon* v. *State* (1875), 51 Ind. 14.

10. Appellant finally insists that there was error on the part of the trial court in admitting in evidence conversations with H. B. Gordon in his absence, and after the consummation of the purpose of the conspiracy, and in admitting in evidence a letter purporting to have been written by appellant without specific proof, at the time, that it was written by him, and in giving to the jury instruction numbered fifteen; and that for these reasons his motion for a new trial should have been granted.

Some of these objections, stated as general propositions of law, are sound, but, when applied to the facts in this case, are untenable. The order in which evidence may be introduced upon a trial is governed by the discretion of the court, and, when from all the evidence it is manifest that the court's rulings were right, no prejudicial error can be asserted merely because, at some particular moment of time in the progress of a trial, a ruling may not have seemed fully justified.

Appellant's co-conspirator waived his privilege and testified in this cause. His evidence sustained all the material elements of the charge against appellant, and was abundantly corroborated by other evidence. The conspiracy charged was thus fully established, and therefore the acts

and declarations of Gordon, the co-conspirator, in further-ance of the common design, were admissible against appel-lant, although done and made in his absence. *McKee* v. *State* (1887), 111 Ind. 378; *Walton* v. *State* (1882), 88 Ind. 9.

Gordon was arrested in the act of attempting to pass the forged check, and what he said at that time and place and in that connection was not objectionable on the ground that the conspiracy had terminated, but was a part of the *res gestae,* within the rule just stated, and admissible. It is an erroneous assumption to say that the object of the conspiracy had been accomplished. The conspiracy was never terminated by agreement of the parties or by the consummation of its aims, but its purpose was thwarted by timely warning and prompt action on the part of the officers of the law.

11. The letter, to the admission of which objection was made, was found upon the person of Gordon at the time of his arrest. He testified, subsequent to its introduction in evidence, that he had received it from appellant. Its admission was, however, fully justified, as a physical fact of an incriminating character, under the rule declared in the case of *Musser* v. *State* (1901), 157 Ind. 423.

Instruction number fifteen is not subject to the criticisms made, but correctly and fairly states the law upon the topic covered by it. There was no error in overruling appellant's motion for a new trial.

12. The sixth and seventh assignments of error were doubtless suggested by the provisions of the act of March 9, 1903 (Acts 1903, p. 338, §8), but that act has no applica-tion to cases of this class, and no question is presented by these assignments.

No error appearing in the record, the judgment is affirmed.