Kevin BOOK, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0707–CR–385.

Court of Appeals of Indiana.

Feb. 25, 2008.

Transfer Denied April 30, 2008.

Julie Ann Slaughter, Marion County Public Defender, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

BAKER, Chief Judge.

In this case, we explore the delicate balance between a trial judge's authority to efficiently control the court proceedings and a defendant's right to confer with counsel before deciding whether and when to testify at trial. Appellant-defendant Kevin Book appeals his conviction for Murder,[1] a felony. Specifically, Book argues that the trial court violated his Fifth and Sixth Amendment rights under the United States Constitution when he was allegedly compelled to make a decision whether to testify at a particular time during the trial. In essence, Book claims that the trial court improperly foreclosed his counsel from determining when—or if—he should testify on his own behalf.

Book also claims that the trial court abused its discretion and violated Indiana Evidence Rule 404(b) in permitting a ten-year-old witness to testify against him, that the evidence is insufficient to support

the conviction, and that the sixty-year sentence is inappropriate. We conclude that the trial court did not unfairly impinge on Book's right to counsel or improperly preclude him from testifying. And finding no other error, we affirm the judgment of the trial court.

FACTS[2]

Sometime during the evening of March 7, 2006, Jennifer Couch and her twenty-month-old daughter, H.C., went to Book's Indianapolis residence to spend the night. Book, who was dating Couch, operated a carpet cleaning business from his house, and Couch was one of Book's employees.

H.C. slept in a bedroom with Book's daughter, who was approximately one month older than H.C. When Couch put H.C. to bed, the mattress, blanket, and sleeper were clean and unstained. Book and Couch then went to bed, and Couch fell asleep while Book watched television. At some point, Book awakened Couch and told her that H.C. was not breathing. When Couch walked into the room, she noticed that H.C. had vomit on the front of her sleeper. Couch called 911 and she and Book performed CPR on H.C. after receiving instructions from the 911 operator.

When the paramedics arrived, Book was standing on the front porch holding H.C., who showed no signs of life. The paramedics attempted to resuscitate her, but when their efforts failed, H.C. was placed in the ambulance and transported to Riley Hospital.

Book and Couch followed the ambulance to the hospital. While Book was driving, he repeatedly asked Couch if she was angry with him and told her that he was "sorry." Tr. p. 423. Shortly after arriving

---

1. Ind.Code § 35–42–1–1.

2. We heard oral argument in this case on January 31, 2008, in Indianapolis. We commend counsel for their able presentations.

at the hospital, staff members informed Couch that they had been unable to resuscitate H.C.

While at the hospital, Book and Couch spoke with Marion County Sheriff's Detective Mark Gullion and Deputy Coroner Justin Thompson about the incident. Book stated that after he heard H.C. cry, he went into the bedroom to calm her, and covered her up at approximately 3:00 a.m. Book claimed that he again checked on H.C. approximately ·one hour later and noticed that she had vomited. Book claimed that when H.C. did not wake up, he took her limp body into the bathroom and noticed that her mouth was full of vomit.

Assistant forensic pediatrician Antoinette Laskey examined H.C.'s body at the morgue. Dr. Laskey observed recent scratches on H.C.'s face, fresh blood from gaping wounds in her mouth that probably had been caused by her teeth, and petechiae [3] over her face and eyelids. Thereafter, forensic pathologist Jennifer Swartz performed an autopsy. In addition to the previous findings, Dr. Swartz discovered recent bruises on H.C.'s back and neck. It was determined that the cause of H.C.'s death was asphyxiation by the mechanical obstruction of the upper airway because of the location of the bruising and hemorrhaging. More specifically, the type and location of the injuries led Dr. Swartz to conclude that a hand was used to smother H.C. She also determined that while the vomit did not actually cause H.C.'s death, it was likely produced as H.C. died. Fresh scratches on H.C.'s face were consistent with H.C. attempting to pry something off her face.

During a search of Book's residence, the police seized H.C.'s mattress, bib, blankets, and some towels. The police also took the sweatpants that Book had worn on the night of March 7, 2006. H.C.'s blood was found on all those items.

On March 13, 2006, Book was charged with murder and neglect of a dependent. A jury trial commenced on May 7, 2007, and during the State's case-in-chief, ten-year-old S.L.—Couch's cousin—testified that she was at Book's house approximately three days before H.C. died. When H.C. walked into the room where Book was attempting to sleep, S.L. saw Book throw a pillow at H.C. and knock her down. Book then told H.C. to "shut the f*ck up." Tr. p. 1182–86. Book did not object to S.L.'s testimony, and the trial court gave the following limiting instruction to the jury:

> At this time the Court does want to give you an admonition. You are being, you are listening to an incident that occurred several days, at least at this point are a different date than the date on which you're making a decision on. You are to only consider this evidence as, as it describes the relationship between H.C. and the defendant. You may not consider it for any other source. Specifically, you may not consider it as being evidence of the defendant's character, nor may you consider it as being that if the defendant did this on such and—on this day before, that he acted on the date of March 10th, or the day in question, that he acted in conformity to that character. You may not consider it for that purpose. You may only consider it for the nature of the relationship between the two.

*Id.* at 1188–89.

At 4:00 p.m. on the fifth day of trial—a Friday—the prosecutor, Book's counsel,

---

**3.** Petechiae are tiny localized hemorrhages from the small blood vessels just beneath the surface of the skin. Hwww.cancerlinksu-sa.com/cancer/young/glossary.htmH (last visited February 5, 2008).

and the trial court engaged in a discussion when Book's counsel expressed a desire to wait and decide whether Book would testify after Dr. Scott Wagner, his only defense witness, testified the next morning. It is undisputed that the trial court had already decided that Dr. Wagner would testify on Saturday to accommodate the witness's schedule and to complete the trial before Monday morning. The exchange was as follows:

MR. BAKER [counsel for Book]: Our first witness would be Dr. Wagner, Judge, and we can certainly have him here pretty early [Saturday] morning. But I, *I know that the Court wants me to make a decision trying to call Mr. Book at this point, but I truthfully can't make such a decision until after we see how Dr. Wagner's testimony goes.*

THE COURT: *I'm not giving you that choice, if you're going to call Mr. Book you've, I've got an hour and fifteen minutes of time here. You don't have to call—you can call somebody else if you want to,* but . . .

MR. BAKER: We, we, our witness would be Dr. Wagner. Judge, I don't know if we will call Mr. Book, and I understand the Court's position of the timing, but also I hope the Court would recognize our right to strategically call witnesses in a certain order, and Mr. Book being the defendant. . . .

THE COURT: *Your . . . right doesn't trump my management of the trial in terms of the timing of the trial.* I'll give you plenty of time to . . . make that decision, and there may be something extraordinary, but, again, the jury has got an hour and fifteen minutes worth of time, as the Court does. I'm not forcing, *I'm not at all forcing you to rest, but I am saying if you've got evidence, other than Dr. Wagner, it needs to be presented today, because the Court be-*

*lieves that with Dr. Wagner, if we, if the defendant can testify, or is going to testify, we can do that today, we can do Dr. Wagner.* If I understand what you all have told me, Dr. Wagner would be the end of the, would, if Dr. Wagner would be the other, the other portion, Dr. Pless then would be, as I understand, the only rebuttal witness unless— do I hear more in terms of rebuttal?

. . .

THE COURT: Which makes me think that, and I will give the jurors the option on this, but I believe if that's the situation, we can, we can finish this trial tomorrow. And so the Court has, the Court wants to finish this if we can. Now, if the jurors decide they don't want to go tomorrow in the afternoon, then I'll probably respect their wishes on that.

Tr. p. 1212–23 (emphases added). Following a brief recess, the exchange continued:

THE COURT: State having rested, other than Dr. Wagner, does Defense wish to present evidence at this time?

MR. COMMONS [co-counsel for Book]: Not at this time, Your Honor. The only other witness we would attempt to recall would be the defendant, and we're not prepared to call the defendant at this point for a couple of reasons. One of which is, is that during the time the Court has been generous enough to give us, we have been conversing with our client and going through the evidence with him. . . . This is the fifth day of the week, with four days worth of evidence to talk to him about in an attempt to determine whether or not his testimony would add in any way to what the testimony, evidence, already is or not, and we've not had the, had the opportunity to go completely through that evidence with him. Secondly, we are at twenty till 5:00 on a Friday . . . . this is

the most important thing that can happen in Kevin Book's life for the next forty or fifty years potentially, and to put him in the position of having to make this decision at this point when he's not prepared yet to testify, and other circumstances when the jury might not be in the most alert form to take in his evidence and evaluate it properly. In addition to that, we've put him in the position of testifying just long enough to allow the Defense to, or the State, rather, to have all night to prepare for the cross examination, an advantage that the State, or the Defense was never provided throughout this trial, the opportunity to prepare the cross examination of a witness all night long. Puts the defendant at a strategic disadvantage which can be avoided by allowing us to first put Dr. Wagner on the witness stand tomorrow and then evaluate whether or not after that testimony ... Mr. Book can add anything that ... will be of benefit to the jury. So one of the main issues that we have to put, put before the Court at this point in time is that Mr. Baker and I are not prepared to present Mr. Book at this point in time because we haven't gone over the entire evidence with him.

THE COURT: Court does not believe that the decision to whether or not the defendant testifies or not is something that just comes up in the course of a week. The defense has had more than a year to consider whether or not it was going to call the defendant, whether he was going to testify. *The Court is giving the Defense an extra day of trial time to present a defense witness. What the Defense is asking the Court to do is give it two days, because attempting to not call a witness when a witness is available means it would be impossible for the Court to complete the trial on Saturday, meaning the Court has to go* *into Monday, meaning the Court cannot take care of its other business. Court has three hundred other cases, nineteen other murder cases.... Court has control of its docket and when, if you choose not to call the witness, that is your choice.* There is no indication from the Court—again it's the Court's exclusive province that the jury is tired, and it can't go until 5:30. Court indicated to jurors it would go till 5:30 if the jurors were willing to do that and have been available. The Court finds absolutely no evidence of fatigue. You may exercise your right, which you have, to not call the defendant, but the Court is indicating that if you are, if you are to call a witness, you are to call a witness now. You can rest if you wish. If you wish to call, to ask the Court for an extension of time to have Dr. Wagner, the Court will grant that, but the Court will not grant an extension for further witnesses at this time.... I'm going to bring the jurors in and we'll ask, other than the same question in front of the jury, other than Dr. Wagner, if you have any other witnesses to present, as the jury, court will advise the jury that we will be hearing Dr. Wagner and Dr. Wagner only, if that's what you choose to do. As to the argument of strategic advantage, I frankly have no idea.

MR. COMMONS: [F]or the record, one of the comments you made was, is that you were granting us an additional day to present evidence. But I would point out that it is the end of the day of the last day of the week, and the State has just rested, so I take exception to the Court's characterization that you're giving us a day.

THE COURT: Well, but I think it's been it's been understood that we weren't going to press to get Dr. Wagner here knowing that he couldn't be here

on Monday. We are going on Saturday to get Dr. Wagner in. I guess maybe I didn't say that correctly, because we can't go on Monday for Dr. Wagner. We have to get, we have to get Dr. Wagner in tomorrow, as I understand it. If I don't get him in, then I understand I won't be able to get him in until Tuesday, which isn't acceptable.

. . .

MR. COMMONS: *After [Dr. Wagner] testifies, that in the event that we would request the defendant at that point [in] time, that you would deny our request to allow him to testify?*

THE COURT: *Given that he's available and has, it is 4:45, and the Court has at least forty-five minutes of time, the Court's not willing to grant a continuance to prepare the defendant's testimony.*

MR. COMMONS: And ... it's not just for preparation of his testimony that we're making our record, Your Honor. It's also that, that *we believe it is his, his right to reserve the opportunity to testify until last so that he can determine all the evidence that's in the record before he has to make that decision.*

THE COURT: Fair enough, and if you want to make that—*I guess I would suggest that if that's what you choose to do, I certainly would have case law ready for me to ask me whether or not I'm willing to reconsider my ruling.* But I'm not ... aware of that. I think this is a situation the Defense always is faced with in terms of timing, as ... everyone else is, and I don't believe it's at all unusual. *But if you can find me, in which he has a constitutional right to go last, and it's of constitutional dimension, the Court ... will be willing to listen to your argument.*

MR. COMMONS: A constitutional right is a right to testify.

THE COURT: *He has a right to testify, but he does not have the right to testify when he wants to testify. He has a right to testify when it's available, and it is available now, and it's 4:45. So let's bring the jurors in.*

*Id.* (emphases added).

In light of the above, Book declined to testify on Friday afternoon. He planned to consult with his attorney about testifying after presenting Dr. Wagner's testimony. Book presented Dr. Wagner's testimony on Saturday morning. Thereafter, Book's counsel made no further argument to the trial court about calling his client to testify; nor did he request that Book be permitted to testify. Instead, Book's counsel rested his case after Dr. Wagner testified.

The jury found Book guilty of murder, and on June 14, 2007, the trial court sentenced Book to sixty years of incarceration. At the sentencing hearing, the trial court identified H.C.'s age and the fact that Book had violated his position of trust over H.C. as aggravating factors. The trial court also identified Book's prior conviction for forgery in 1990 and the fact that forgery is a crime of dishonesty as a relatively "insignificant" aggravating circumstance. *Id.* at 1603. No mitigating factors were found, and Book now appeals.

## DISCUSSION AND DECISION

### I. Due Process, Self–Incrimination, and Right to Counsel

Book maintains that the trial court violated his right to due process, his right against self-incrimination and his right to counsel when he was purportedly compelled to testify at a particular point during the trial. More specifically, Book argues that he was forced to testify "at the trial court's behest or not at all, during the presentation of his defense rather than

when Book's counsel determined it best to decide whether Book should testify after the defense witnesses." Appellant's Br. p. 5. Book maintains that the trial court's decision to dictate the manner and order in which he and his counsel would present his defense essentially destroyed his constitutional right to determine whether he would testify on his own behalf. The Fifth Amendment to the United States Constitution provides that

> [n]o person shall be held to answer for a capital or otherwise infamous crime ... nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. Amend. V.

█ As discussed above, Book did not testify at trial. Thus, his contention that his Fifth Amendment rights were violated because he was "compelled to be a witness against himself" fails. Nonetheless, Book points out that inherent in the right of an accused not to be compelled to testify and the right to due process is the accused's right to the assistance of counsel in executing and preserving those rights.

In *Miranda v. Arizona*, 384 U.S. 436, 442, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court discussed the interplay of the Fifth Amendment right not to be compelled to testify, due process, and the Sixth Amendment right to counsel:

> We have undertaken a thorough re-examination of the *Escobedo* decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution—that "No person ... shall be compelled in any criminal case

to be a witness against himself," and that "the accused shall ... have the Assistance of Counsel"—rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured "for ages to come, and ... designed to approach immortality as nearly as human institutions can approach it."

(Quoting *Cohens v. Commonwealth of Virginia*, 6 Wheat. 264, 5 L.Ed. 257 (1821). Given this pronouncement, Book maintains that the right to due process includes having the accused and his counsel determine the order of witnesses and decide whether the accused will testify because those "rights and processes are the bedrock of the constitutional safeguards given one accused of a crime." Appellant's Br. p. 14. In short, Book maintains that these rights should "trump" a trial court's desire to manage its docket and "speed things along," *id.* at 14, and it was apparent that the trial court simply did not want to release the jury at 4:45 p.m. on a Friday.

In addressing Book's contentions, we initially observe that Book failed to make a contemporaneous objection to the trial court's ruling regarding the decision to testify. Moreover, Book declined the trial court's invitation to "revisit its ruling," and he did not make an offer of proof later in the case. Rather, Book chose to rest his case after Dr. Wagner testified. Appellee's Br. p. 7. Although Book contends that he had no obligation to make an offer of proof "because it is impossible to demonstrate what your testimony would be if you are still waiting for the testimony of another witness," appellant's reply br. at 6, the record shows that this case was pending for approximately fourteen months before the jury trial commenced. The dis-

covery process began shortly after Book was charged and it continued throughout the course of the proceedings. Appellant's App. p. 47, 49, 55, 57, 61, 66, 70, 72, 78, 100–12, 149, 241. Witness lists were exchanged on numerous occasions, depositions were taken, and pretrial conferences were held. *Id.* at 70, 80, 84, 86, 137, 153, 163, 178–80, 236.

Dr. Wagner testified that he had reviewed H.C.'s medical charts, the autopsy report, photographs, statements of the EMTs, and several "expert" reports in preparation for his testimony. Tr. p. 1239. In light of the continuous and extensive discovery process, Dr. Wagner's preparation for trial, and Book's frequent consultations with his trial counsel prior to trial, Book certainly knew what the substance of his testimony would be well before Dr. Wagner testified. Consequently, we reject Book's claim that "defense counsel's strategy for [his] questioning relied upon his examination and the cross examination of Dr. Wagner." Reply Br. at 6. In light of these circumstances, Book's claim that his right to counsel and due process rights were violated because he allegedly could not have made an offer of proof in these circumstances is unavailing. For all of these reasons, Book has waived the issue. *Vandivier v. State,* 822 N.E.2d 1047, 1051 (Ind.Ct.App.2005) (holding that the failure to make a proper objection at trial results in waiver of the issue on appeal); *Dowdell v. State,* 720 N.E.2d 1146, 1150 (Ind.1999) (holding that a defendant's failure to make an offer of proof waives any error in the exclusion of witnesses).

 In an effort to avoid waiver, Book asserts that fundamental error occurred. The fundamental error exception to the waiver rule is available only where the record reveals clearly blatant violations of basic and elementary principles of due process and the harm or potential for harm cannot be denied. *Law v. State,* 797 N.E.2d 1157, 1167 (Ind.Ct.App.2003). Moreover, the exception is an "extremely narrow one." *Id.*

In *Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the United States Supreme Court described a trial court's duties and powers as follows:

> Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice. "[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States,* 289 U.S. 466, 469 [53 S.Ct. 698, 77 L.Ed. 1321] (1933). A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; [and that] determination will be reviewed only for abuse of discretion.... *Goldsby v. United States,* 160 U.S. 70, 74 [16 S.Ct. 216, 40 L.Ed. 343] (1895) [citations omitted]. Within limits, the judge may control the scope of rebuttal testimony ...; may refuse to allow cumulative, repetitive, or irrelevant testimony ...; and may control the scope of examination of witnesses.... If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings.

Like the federal system, our Supreme Court has held that a trial court has wide latitude to direct the order of proof. *Haak v. State,* 695 N.E.2d 944, 950 (Ind.1998); Ind. Evid. Rule 611(a). As was observed in *James v. State,* 613 N.E.2d 15, 23 (Ind.

1993), "[t]he trial judge must conduct the proceedings in a manner that facilitates ascertainment of the truth, insures fairness and obtains economy of time and effort commensurate with the rights of both society and the criminal defendant." Also, it has been determined that the order in which evidence may be introduced during a trial is within the trial court's discretion, and when it is apparent from all the evidence that the court's rulings were correct, no prejudicial error can be asserted merely because, at some particular moment of time in the progress of a trial, a ruling may not have seemed fully justified. *Knox v. State,* 164 Ind. 226, 236, 73 N.E. 255, 259 (1905).

Turning to another United States Supreme Court case, in *Herring v. New York,* 422 U.S. 853, 865, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), it was determined that the defendant's right to the effective assistance of counsel was violated because defense counsel was not permitted to make a closing argument in the defendant's bench trial. Specifically, the *Herring* court observed that "the right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process." *Id.* at 857, 95 S.Ct. 2550. The court in *Herring* further commented that when considering the constitutionality of such "state interference," courts are directed to determine whether the interference denied counsel "the opportunity to participate fully and fairly in the adversary factfinding process." *Id.* at 858, 95 S.Ct. 2550.

We also note that prior to *Herring,* the United States Supreme Court decided *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), which held that a statute requiring the defendant to testify as the first defense witness—or not

at all—was a denial of due process that deprived the defendant of the " 'guiding hand of counsel' in the timing of this critical element of the defense." *Id.* at 613, 92 S.Ct. 1891. The *Brooks* court also noted that "[w]hile nothing we say here otherwise curtails in any way the ordinary power of trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." *Id.* The *Brooks* court went on to observe that, under certain circumstances, such a practice could result in a violation of a defendant's Fifth Amendment right to remain silent and the right to due process. *Id.* at 609–13, 92 S.Ct. 1891.

However, unlike the circumstances in *Brooks,* we are not confronted with statutory or categorical limitations in this case. Moreover, nothing in *Brooks* implies that there is an unqualified right for criminal defendants to testify *last.* We note that courts in other jurisdictions have been confronted with circumstances involving a trial court's authority to decide when a defendant should testify. *See, e.g., Harris v. Barkley,* 202 F.3d 169, 172–75 (2d Cir. 2000) (holding that an order requiring the defendant to testify, if at all, before a nonparty witness who was not available until the following day, in accordance with a prior order mandating that the defense have all witnesses available to testify, was within the trial court's discretion to set the trial schedule and did not violate the defendant's constitutional rights, particularly when the witness's delayed appearance was because of the defendant's failure to subpoena him or otherwise secure his presence as mandated); *United States v. Singh,* 811 F.2d 758, 762 (2d Cir.1987) (holding that the trial court acted within its discretion in refusing to accept the proffered testimony of non-party witnesses unless and until the defendant had testi-

fied and established a proper foundation and noting that unlike in *Brooks,* the trial court here had not applied a categorical rule and indeed had not compelled the defendant to testify); *United States v. Leon,* 679 F.2d 534, 538 (5th Cir.1982) (holding that where the defendant had already decided to testify, no *Brooks* error occurred when the trial court forced the defendant to testify before a witness who was delayed and could not appear until the following day, observing that the trial judge possesses "substantial latitude" to "keep the trial from stalling in mid-afternoon").[4]

In light of these holdings, it follows that any prospective harm that Book may have sustained as a result of the trial court's ruling did not come to fruition because Book forewent any attempt to testify after he presented his defense witness and consulted with his counsel. Moreover, as noted above, Book did not perform any subsequent research on his alleged claim of error or present further argument to the trial court on Saturday, despite the trial court's invitation to do so. Even more compelling, Book made no additional request to the trial court regarding an alleged desire to testify, and there is nothing in the record establishing that Book even desired to testify after Dr. Wagner presented his testimony. Hence, Book has failed to show how the trial court's actions resulted in any harm. In short, Book has not demonstrated that the trial court prevented his counsel's full and fair participation in the adversary factfinding process. *Herring,* 422 U.S. at 858, 95 S.Ct. 2550. As a result, Book's contention that the failure to attempt to enforce his right to testify was due the fault of the trial court does not prevail.

## II. Testimony of H.C.'s Cousin

 Book claims that his conviction must be reversed because S.L. was improperly permitted to testify regarding Book's prior act of throwing a pillow at H.C. and telling her to "shut the f*ck up." Appellant's Br. p. 16–19. In essence, Book contends that such evidence was irrelevant and "highly prejudicial" in violation of Indiana Evidence Rule 404(b).

 In resolving this issue, we initially observe that the admission of evidence is within the sound discretion of the trial court and the decision will not be reversed absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Sallee v. State,* 777 N.E.2d 1204, 1210 (Ind.Ct.App.2002). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We also note that relevant evidence, which is evidence having any tendency to make the existence of any fact or consequence more or less probable, is admissible. Ind. Evidence Rules 401, 402. However, relevant evidence should nevertheless be excluded if the probative value of the evidence is substantially outweighed by its prejudicial effect. Evid. R. 403; *Jackson v. State,* 712 N.E.2d 986, 988 (Ind.1999).

In this case, Book's counsel did not object to the admission of S.L.'s testimony at trial. As a result, the issue is waived. *See Kirby v. State,* 774 N.E.2d 523, 533 (Ind. Ct.App.2002) (holding that the failure to timely object to the admission of evidence regarding the defendant's involvement in dealing drugs during the year immediately preceding the crime resulted in a waiver of the issue).

---

4. While we do not find that the trial court's conduct here rises to the level prohibited by *Brooks,* we recognize that limits exist with respect to trial courts' case management in-

terests which can impact on the effective assistance of counsel. While the trial judge's conduct here does not cross that line, it certainly may have approached it.

■ Waiver notwithstanding, Book directs us to Indiana Evidence Rule 404(b) in support of his contention that S.L.'s testimony amounted to fundamental error:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

In light of this provision, Book argues that admitting S.L.'s testimony was erroneous because the "sole logical purpose of [S.L.'s] testimony was to put into the minds of the jury that [because Brook] threw a pillow at the child for screaming" on a prior occasion, Book acted in conformity with that prior behavior when he killed H.C. the days later for crying. Appellant's Br. p. 20. Thus, Book claims that his conviction must be reversed because S.L.'s testimony "had nothing to do with H.C.'s death," and it did not demonstrate motive, intent, planning, preparation or any other permissible exception to Indiana Evidence Rule 404(b). *Id.*

As discussed above, although the trial court permitted S.L. to testify regarding Book's specific prior acts, but it provided the jurors with a cautionary instruction to prevent the jurors from drawing the impermissible inference that Book acted in conformity with the character evidence. Moreover, the trial court conveyed to the jury that it was to consider S.L.'s testimony for the limited purpose of understanding the relationship between H.C. and Book:

> THE COURT: Okay. Well, the, I think what you've indicated goes to its weight and not its admissibility, and the Court is going to allow it in. As I indicated before, the Court is going to give, when-

ever this occurs, cautionary instruction that the jurors may not draw the impermissible inference that the defendant acted in conformity with character evidence on this. If the jury wishes to consider it as to what the nature of the relationship was between the parties they may do it, but for that limited purpose only.

Tr. p. 11.

Although Book maintains that the trial court did not conduct a proper balancing test as to whether the prejudicial impact of the S.L.'s testimony outweighed its probative value, no argument was presented to the trial court regarding the alleged prejudicial nature of S.L.'s testimony. Indeed, at a hearing on Book's motion in limine, he only asserted that S.L. was not a credible witness. *Id.* at 7–11. Moreover, it is apparent that the trial court admitted S.L.'s testimony to show the nature of the relationship between Book and S.L. *See Brown v. State,* 659 N.E.2d 652, 655 (Ind. Ct.App.1995) (holding that in a manslaughter prosecution, evidence of the defendant's prior fights and abuse with the victim was properly admitted to show the relationship between the parties and the absence of accident). For these reasons, we conclude that the admission of S.L.'s testimony regarding Book's prior incident with H.C., coupled with the trial court's admonishment to the jury, was not fundamental error.

### III. Sufficiency of the Evidence

Book next claims that the evidence was insufficient to support his conviction for murder. Specifically, Book argues that the State "presented no evidence to demonstrate that [he] had anything to do with [H.C.'s] death, ... [and] the State relied upon false innuendo and irrelevant testimony that violated the rules of evidence." Appellant's Br. p. 22.

When reviewing a challenge to the sufficiency of evidence to support a conviction, we will not reweigh the evidence or judge the credibility of the witnesses. Moreover, we respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State*, 820 N.E.2d 124, 125 (Ind.2005). We have often emphasized that appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* Expressed another way, we will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty. *Id.*

Indiana Code section 35–42–1–1 provides that "a person who knowingly or intentionally kills another human being commits murder, a felony." A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. Ind.Code § 35–41–2–2(a). An individual engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. I.C. § 35–41–2–2(b). It is generally presumed that a person intends the natural, necessary, and probable consequences of his or her acts. *Johnson v. State*, 455 N.E.2d 932, 937 (Ind. 1983).

In this case, two forensic pathologists testified that H.C. died because "some sort of mechanical suffocation" occurred. Tr. p. 207–10, 229–30, 1433–42. The forensic pathologist who performed the autopsy testified that H.C. was likely smothered with a hand. *Id.* It was also determined that H.C. had bled from gaping wounds in her mouth that occurred when external pressure was applied to her face. *Id.* at 229–30, 665–66, 1434–42. Blood was discovered on H.C.'s possessions and on Book's clothing. *Id.* at 987–1000. The forensic pathologist testified that the only mechanism capable of producing the type of injuries that H.C. sustained, given their particular placement and quantity, was a hand. *Id.* at 229–30.

In light of this evidence, the jury could have drawn the reasonable inference that Book placed his hand over H.C.'s mouth and smothered her as Jennifer slept in the next room. Moreover, the jury could have reasonably concluded that Book's actions constituted murder. In essence, Book is asking us to reweigh the evidence and reassess the credibility of the witnesses. This, we cannot do under our well-established standard of review. *McHenry*, 820 N.E.2d at 125. As a result, we conclude that the evidence was sufficient to support Book's conviction.

## IV. Sentencing

Finally, Book argues that his sentence must be set aside because the sixty-year sentence was inappropriate in light of the nature of the offense and his character. In essence, Book argues that an aggravated sentence was not warranted because an otherwise "truly caring and nonviolent individual can snap." Appellant's Br. p. 23–24. Therefore, Book contends that he is entitled to a reduced sentence because he should not be considered "one of the very worst offenders." *Id.* at 24.

This court has the authority to revise a sentence if, "after due consideration of the trial court's decision," it is found that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). We defer to the trial court during appropriateness review, *Stewart v. State*, 866 N.E.2d 858, 866 (Ind.Ct.App. 2007), and we refrain from merely substituting our judgment for that of the trial court. *Golden v. State*, 862 N.E.2d 1212, 1218 (Ind.Ct.App.2007), *trans. denied.* The burden is on the defendant to per-

suade the reviewing court that his sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006).

 At the sentencing hearing, the trial court found no mitigating factors and commented as follows:

> The Court notes that the Defendant does have a prior criminal history, which I have to indicate that I was quite surprised when I read that Pre–Sentence Report. Mr. Book, I honestly didn't expect to see that. It is an aggravator that the Court won't find that it's a significant aggravator but the Court does note that forgery is a crime of dishonesty. And even though it is a 1990 conviction, uh, and while it may seem somewhat remote, it is still a crime of dishonesty. And this particular homicide in relationship to the parties, and the unwillingness to recognize the physical evidence is somewhat a betrayal of truth and honesty that makes it difficult for the families to understand and live ... and accept what happened. Recognizing the standard of the review, the Court does not find that a significant aggravator but does find it an aggravator nonetheless.

Tr. p. 1603.

When considering the nature of the offense, the evidence established—and the trial court observed—that Book killed H.C., a twenty-month-old toddler who was in his care, while Jennifer slept. *Id.* at 1602. Book betrayed the trust of H.C. and her mother when he smothered H.C. with his hand in the middle of the night. That said, we can only conclude that the heinousness of this crime is perhaps even more chilling than other crimes of murder. As a result, the particularly serious nature

of Book's crime supports the sentence that the trial court imposed, and Book's nature of the offense argument does not aid his inappropriateness claim.

Turning to Book's character, the trial court observed that Book had a prior conviction for forgery in 1990. Tr. p. 1603. Although Book seems to imply that the trial court could have even identified his single, prior unrelated conviction as a mitigating factor, our Supreme Court has recognized that a trial court is under no obligation to afford mitigating weight to a defendant's prior criminal actions. *Robinson v. State,* 775 N.E.2d 316, 321 (Ind. 2002).

We also reject Book's argument that an enhanced sentence was not warranted because he "probably snapped." Appellant's Br. p. 23. In *Powers v. State,* 696 N.E.2d 865, 868 (Ind.1998), our Supreme Court held that a murder defendant was not entitled to a jury instruction on voluntary manslaughter because the crying of the five-month-old victim did not constitute the provocation necessary to qualify the defendant's actions as "sudden heat." *See also Patterson v. State,* 532 N.E.2d 604, 607 (Ind.1988) (holding that an incident of bedwetting by a six-year-old child was not provocation to give rise to sudden heat). When considering the principles set forth in *Patterson* and *Powers,* we will not accept the notion that H.C.'s alleged crying or fussiness amounted to a provocation that warranted a reduced sentence.

Finally, we note that even though Book might not be the worst offender that this court has ever seen, Book did not receive the worst punishment that could have been imposed, inasmuch as he did not receive the maximum sentence permitted for murder.[5] Thus, when considering the nature

5. Indiana Code section 35–50–2–3 provides that "a person who commits murder shall be imprisoned for a fixed term of between forty-

five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years."

of the offense and Book's character, we do not find the sixty-year sentence inappropriate.

The judgment of the trial court is affirmed.

DARDEN, J., and CRONE, J., concur.