**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 10 2012, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS W. VANES**
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MARLON L. PENDLETON, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 45A04-1110-CR-544 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE LAKE CIRCUIT COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-0812-MR-9

**July 10, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Marlon L. Pendleton ("Pendleton") appeals his conviction of Voluntary Manslaughter as a Class B felony.[1]

We affirm.

**Issue**

The sole issue raised on appeal is whether the State presented sufficient evidence to prove beyond a reasonable doubt that Pendleton knowingly or intentionally killed the victim.

**Facts and Procedural History**

Pendleton and Dannette Adkins ("Adkins") were involved romantically. At times, Pendleton lived with Adkins in her father's home in Hammond; at other times he lived down the street with his sister, Jacqueline Pendleton ("Jacqueline"). Pendleton and Adkins had a tempestuous relationship characterized by many arguments. They had been observed swinging at each other in the middle of the street and pulling and shoving each other on some stairs. Pendleton had also hit Adkins with his fist.

On the evening of December 17, 2008, Pendleton and Adkins were arguing loudly as they sat in a gray Saturn automobile owned by Jacqueline but driven by both Pendleton and Adkins. At 12:33 a.m. on December 18, 2008, police received a 911 call from Adkins regarding a domestic disturbance at her residence. Investigating police found Adkins in the front yard and Pendleton in the back. When officers escorted Pendleton around the house, Pendleton and Adkins began arguing again. Both appeared to have been drinking; Adkins

---

[1] Ind. Code § 35-42-1-3.

2

seemed intoxicated. Police asked Pendleton about blood on his face and he accused Adkins of stabbing him. Adkins had minor bruising below her right eye, which she claimed Pendleton caused two days earlier. Neither Pendleton nor Adkins wanted to press charges; however, Adkins stated that Pendleton was threatening to kill her father, and she wanted him to leave. Pendleton took some of his belongings and walked toward his sister's house. Police left at approximately 1:00 a.m.

Sometime soon thereafter, neighbors heard Adkins screaming for help. One neighbor saw Pendleton and Adkins arguing in the Saturn, which was parked in the backyard of the Thompson house. Pendleton was in the driver's seat and Adkins was in the passenger seat. No one called the police, as the couple had been arguing "all summer long." (Tr. at 547.)

At some point that morning, Jacqueline was awakened by Adkins and Pendleton knocking on her front door. She allowed them onto the porch of her home but, about twenty minutes later, asked them to leave because of their loud arguing over the police visit earlier that morning. The couple left and Jacqueline thought she heard the Saturn drive away. When Jacqueline left for work around 6:00 a.m., neither Pendleton nor Adkins was there. But after Jacqueline's son dressed for high school, Pendleton returned with Adkins, who had swollen eyes and dried blood on her bruised and swollen face. Adkins fell while walking to the bathroom. Pendleton asked for towels, claiming that he found Adkins in that condition. At 8:44 a.m., after seeing Adkins, another resident of the house called 911. Pendleton began performing CPR on Adkins.

Paramedics found Adkins unconscious and nonresponsive. She had no pulse, no heart

3

activity, and was not breathing. She was cold to the touch. Her head, neck and face were "very swollen," her eyes were swollen shut, and blood was coming from her nose and ear. (Tr. at 863.) During intubation, dark-colored blood was discovered in the back of her throat. Adkins was taken to the hospital where she was briefly revived; however, at 9:37 a.m., she died from what was determined to be blunt force trauma to the head.

An autopsy later revealed various injuries on Adkins' face, head, neck, and body, with a dominant left-sided injury pattern. Several fingernails were broken. Approximately seventy to eighty percent of Adkins' head was injured from multiple blows. She had also suffered a rib fracture. Most injuries were consistent with the use of a fist and were inflicted within four to twelve hours before death, with midnight to 2:00 a.m. being the most likely time frame.

Investigators discovered that the back of Pendleton's hands were swollen, red and bruised. An unknown milky-white film covered most windows of the Saturn. Inside the vehicle, described as a "crime scene," police found a broken dome light, a broken cassette tape, a broken ice scraper and what looked like fresh cuts in the roof liner. (Tr. at 625.) Adkins' blood was found on the broken ice scraper, on the seat and other items in the Saturn, and on Pendleton's clothing. Some blood was transferred by contact, some was expirated, i.e., blown from an airway, and some occurred from "heavy passive dripping." (Tr. at 835.)

On December 20, 2008, the State charged Pendleton with murder and voluntary manslaughter as a Class A felony. The voluntary manslaughter charge was later reduced to a Class B felony. Pendleton's first trial ended with a deadlocked jury and, on September 20,

4

2010, the trial court declared a mistrial. A second trial commenced on August 8, 2011. Two lesser offenses, involuntary manslaughter and reckless homicide, were added for consideration. The second jury found Pendleton not guilty of murder but guilty of voluntary manslaughter, for which the trial court imposed a seventeen-year sentence. Pendleton now appeals.

## Discussion and Decision

### Standard of Review

The standard of review for sufficiency-of-evidence claims is well-settled. We neither reweigh evidence nor judge witness credibility, and we respect the jury's exclusive province to weigh conflicting evidence. Delarosa v. State, 938 N.E.2d 690, 697 (Ind. 2010). We consider only the probative evidence and reasonable inferences that support the verdict. Id. We affirm if the probative evidence and reasonable inferences drawn therefrom could have permitted a reasonable jury to find the defendant guilty beyond a reasonable doubt. Id.

### Analysis

Indiana Code Section 35-42-1-3, in pertinent part, provides:

(a) A person who knowingly or intentionally:
(1) kills another human being; . . .
while acting under sudden heat commits voluntary manslaughter, a Class B felony. . . .

(b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) of this chapter to voluntary manslaughter.

Here, Pendleton insists that the State did not establish that he knowingly or intentionally killed Adkins. An individual engages in conduct "knowingly" if, when he

5

engages in the conduct, he is aware of a high probability that he is doing so. Ind. Code § 35-41-2-2(b); Book v. State, 880 N.E.2d 1240, 1252 (Ind. Ct. App. 2008), trans. denied. A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. I.C. § 35-41-2-2(a); Book, 880 N.E.2d at 1252. It is generally presumed that a person intends the natural, necessary, and probable consequences of his acts. Book, 880 N.E.2d at 1252.

Intent is a mental state, and absent an admission, the jury must resort to reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences that might be expected from that conduct, there exists a showing or inference of the required criminal intent. M.Q.M. v. State, 840 N.E.2d 441, 446 (Ind. Ct. App. 2006) (citation omitted). The intent to commit murder may be inferred from the nature of the attack and the circumstances surrounding the crime. Whatley v. State, 908 N.E.2d 276, 284 (Ind. Ct. App. 2009), trans. denied.

The evidence favorable to the verdict shows that neighbors first heard Adkins scream at approximately 1:00 a.m. on December 18, 2008; paramedics were called at 8:33 a.m. During that timeframe, Pendleton struck repeated blows to Adkins' face, head, and body, particularly on the left side. Adkins' injuries covered over seventy to eighty percent of her head, in the front, left and back. The harsh beating caused hemorrhaging inside her skull that ultimately resulted in her death.

Pendleton insists that Adkins' injuries would not have been apparent so that he was

6

alerted that a fatal assault was underway. His argument is merely an invitation to review the evidence, which we may not do. The record demonstrates that Pendleton used his fist and part of an ice scraper to beat Adkins repeatedly about the head. Adkins bled in the car and on Pendleton's clothing; her face and eyes were swollen and bruised. Adkins sustained "lots and lots of smaller injuries" as opposed to "one great big one." (Tr. at 910.) Thus, she would have exhibited a gradual decrease of mental functioning, coordination, and voluntary movements. A jury could reasonably have concluded that Pendleton was alerted to Adkins' serious injuries.

In determining whether a defendant was aware of the high probability that his actions would result in the death of a victim, a jury may consider the duration and brutality of a defendant's actions, and the relative strengths and sizes of a defendant and victim. Blanchard v. State, 802 N.E.2d 14, 38 (Ind. Ct. App. 2004). Here, Pendleton was five feet, ten inches tall and weighed one hundred and fifty pounds. Adkins was five feet tall and weighed one hundred and five pounds. Pendleton's size and weight gave him an advantage over Adkins and he used that advantage to brutally attack her. The nature and extent of Adkins' injuries to her head permit an inference that, at a minimum, Pendleton knowingly killed Adkins. We conclude that the State presented sufficient evidence to prove beyond a reasonable doubt that Pendleton acted with the required intent when he killed Adkins.

Affirmed.

ROBB, C.J., and MATHIAS, J., concur.