840 N.E.2d 441 (2006)
M.Q.M., Appellant-Respondent,
v.
STATE of Indiana, Appellee-Petitioner.
No. 44A05-0508-JV-458.
Court of Appeals of Indiana.
January 18, 2006.
*442 Nancy A. McCaslin, McCaslin & McCaslin, Elkhart, for Appellant.
*443 Steve Carter, Attorney General of Indiana, Mara McCabe, Deputy Attorney General, Indianapolis, for Appellee.

OPINION
CRONE, Judge.

Case Summary
M.Q.M. appeals from the juvenile court's dispositional order adjudicating him to be a delinquent child for committing possession of a substance represented to be a controlled substance, a class C misdemeanor if committed by an adult, and auto theft, a class D felony if committed by an adult. We affirm in part, vacate in part, and remand.

Issues
We restate M.Q.M.'s two issues as the following three:
I. Whether sufficient evidence supports the juvenile court's true findings for possession of a controlled substance represented to be a controlled substance and auto theft;
II. Whether the juvenile court abused its discretion in placing him at the Kokomo Academy; and
III. Whether the juvenile court improperly ordered him to pay fees without inquiring as to his or his parents' ability to pay.

Facts and Procedural History
The facts most favorable to the adjudication indicate that on February 26, 2004, M.Q.M. told students at his junior high school that he had cocaine in his locker. Several students told the junior high school principal about M.Q.M.'s statements. The junior high school principal and the high school principal escorted M.Q.M. to his locker and confronted him about his statements. M.Q.M. admitted that he had told other students that he had cocaine. Tr. at 6, 12. The junior high school principal searched M.Q.M.'s locker and found a clear plastic bag containing both a white powdery substance and a package labeled "Jim Dandy® Enriched Quick Grits." State's Ex. A. M.Q.M. stated that the substance was corn grits, not cocaine. Both principals were unsure what the substance was and called the police. Tr. at 8, 13, 14. The substance was later determined to be corn grits. In May 2004, the State filed a delinquency petition alleging that M.Q.M. committed possession of a substance represented to be a controlled substance, a class C misdemeanor if committed by an adult.[1]
On August 4, 2004, M.Q.M. and his friends M.S. and R.S. attended T.G.'s birthday party. M.Q.M. and M.S. went to M.Q.M.'s house, which was locked. M.Q.M. retrieved a house key from his father's truck, entered the house, and took the key to his parents' automobile. M.Q.M. and M.S. took turns driving the car for about twenty minutes. They returned the car and went back to T.G.'s birthday party, where they talked R.S. into going for another ride. None of the youths was a licensed driver. M.S. drove the car down a dirt road, spun out of control, and crashed into a fence. The trio exited the car and ran through a nearby cornfield, where police apprehended them. In September 2004, the State filed a delinquency petition alleging that M.Q.M. committed auto theft, a class D felony if committed by an adult, and leaving the scene *444 of a property damage accident, a class A misdemeanor if committed by an adult.
The juvenile court conducted a factfinding hearing on both petitions on April 12, 2005, and subsequently entered true findings for possession and auto theft. On July 11, 2005, the court held a dispositional hearing and entered an order that reads in relevant part:
1. The Court enters adjudication.
2. The Juvenile shall be placed at the Kokomo Academy on July 12, 2005 until December 19, 2005.
3. The juvenile shall be placed on probation for a period of two (2) years under the Court's standard terms and conditions of probation. [He] shall pay an initial probation user fee of $50.00 and $15.00 monthly during the period of reporting probation.
4. The juvenile shall pay a docket fee of $151.00 within 90 days and a $100.00 administrative fee.
5. The Juvenile shall complete 24 hours of community service during the period of his probation.
6. The Juvenile will be involved in after school activities.
7. The Court now sets this matter for a Review Hearing on December 19, 2005 at 9:00 A.M.
Appellant's App. at 4. This appeal ensued.

Discussion and Decision

I. Sufficiency of Evidence
M.Q.M. challenges the sufficiency of the evidence supporting the juvenile court's true findings. Our standard of review is well settled:
We neither reweigh the evidence nor judge the credibility of witnesses. The State must prove beyond a reasonable doubt that the juvenile committed the charged offense. We examine only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. We will affirm if there exists substantive evidence of probative value to establish every material element of the offense. Further, it is the function of the trier of fact to resolve conflicts in testimony and to determine the weight of the evidence and the credibility of the witnesses.
K.D. v. State, 754 N.E.2d 36, 38-39 (Ind.Ct.App.2001) (citations omitted).
We first address M.Q.M.'s contention that the State did not prove beyond a reasonable doubt that he possessed a substance represented to be a controlled substance, a class C misdemeanor if committed by an adult. Indiana Code Section 35-48-4-4.6(b) defines that offense as follows: "A person who knowingly or intentionally possesses a substance described in section 4.5 of this chapter commits a Class C misdemeanor." (Emphasis added.) Indiana Code Section 35-48-4-4.5 states:
(a) A person who knowingly or intentionally delivers or finances the delivery of any substance, other than a controlled substance or a drug for which a prescription is required under federal or state law, that:

(1) is expressly or impliedly represented to be a controlled substance;

(2) is distributed under circumstances that would lead a reasonable person to believe that the substance is a controlled substance; or

(3) by overall dosage unit appearance, including shape, color, size, markings, or lack of markings, taste, consistency, or any other identifying physical characteristic of the substance, would lead a reasonable person to believe the substance is a controlled substance; *445 commits dealing in a substance represented to be a controlled substance, a Class D felony.
(b) In determining whether representations have been made, subject to subsection (a)(1), or whether circumstances of distribution exist, subject to subsection (a)(2), the trier of fact may consider, in addition to other relevant factors, the following:

(1) Statements made by the owner or other person in control of the substance, concerning the substance's nature, use, or effect.
(2) Statements made by any person, to the buyer or recipient of the substance, that the substance may be resold for profit.
(3) Whether the substance is packaged in a manner uniquely used for the illegal distribution of controlled substances.
(4) Whether:
(A) the distribution included an exchange of, or demand for, money or other property as consideration: and
(B) the amount of the consideration was substantially greater than the reasonable retail market value of the substance.
(Emphases added.)
It is undisputed that M.Q.M. knowingly or intentionally possessed the corn grits and that he expressly represented them to be cocaine, a controlled substance.[2] As the italicized portions of the statutes make clear, this is all that is required to sustain a true finding of possession of a substance represented to be a controlled substance pursuant to Indiana Code Section 35-48-4-4.6(b).[3] The plain language of that statute dictates that we disregard the "delivery/finance/dealing" language in Indiana Code Section 35-48-4-4.5(a) and focus on the description of the substance itself, as the crime of dealing is separate and distinct from the crime of possession. We therefore affirm the juvenile court's true finding as to this offense.
We now address M.Q.M.'s contention that the State did not prove beyond a reasonable doubt that he committed auto theft, a class D felony if committed by an adult. Indiana Code Section 35-43-4-2.5(b) defines auto theft in pertinent part as the knowing or intentional exertion of unauthorized control over the motor vehicle of another person, with intent to deprive the owner of the vehicle's value or use. M.Q.M. does not dispute that he knowingly exerted unauthorized control over his parents' car, as the State alleged.[4] Instead, he asserts that the State failed to prove that he intended to deprive his parents of the car's value or use. We agree.
Until 1971, the general theft statute (currently Indiana Code Section 35-43-4-2) defined theft in relevant part as the knowing exertion of unauthorized control over the owner's property with the intent to "`deprive the owner permanently of the use or benefit of the property[.]'" Nicholas v. State, 261 Ind. 115, 118, 300 N.E.2d 656, 659 (1973) (quoting Ind.Code § 35-17-5-3 (LexisNexis 1972)). In 1971, the legislature deleted the word "permanently" from the theft statute. Id. Since then, *446 however, our supreme court has continued to read "permanently" into the theft statute to distinguish theft from criminal conversion, which Indiana Code Section 35-43-4-3(a) defines as the knowing or intentional exertion of unauthorized control over property of another person. See, e.g., In re Kouros, 735 N.E.2d 202, 204-05 (Ind.2000) ("The parties further agree that by allowing client funds held in trust to be used for purposes unrelated to the client without the clients' knowledge or consent, the respondent converted the clients' funds. ... While it is true that, in the present case, the respondent temporarily used at least some client funds to cover his gambling debts, ... the agreed facts here evidence no intent permanently to deprive clients of their funds. This conclusion is fortunate for the respondent, since outright theft of client funds generally warrants very severe sanction, up to and including disbarment."); Chanley v. State, 583 N.E.2d 126, 130 (Ind.1991) (upholding refusal of theft defendant's instruction on lesser included offense of conversion: "Here, the element which distinguishes the greater [offense of theft] from the lesser [offense of conversion] is whether Chanley intended to deprive the owners of the use of their vehicles permanently or for an indefinite period of time. ... We do not find any `serious evidentiary dispute' relating to Chanley's intent to deprive, and find it inconceivable that he had any intention to return either vehicle."); Decker v. State, 528 N.E.2d 1119, 1121-22 (Ind.1988) (same issue: "The distinguishing factor between theft and conversion is the intent to deprive the true owner of the use or value of the stolen goods. ... There is no serious dispute of any probative value in the evidence concerning Decker's intent to permanently deprive the University of the use and value of its property."), overruled on other grounds by Wright v. State, 658 N.E.2d 563, 566 (Ind.1995).
The auto theft statute was first enacted in 1985, and we see no reason to interpret it differently from the general theft statute with respect to the element of intent to deprive.[5] "Intent is a mental state, and absent an admission, the [factfinder] must resort to the reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences that might be expected from that conduct, there exists a showing or inference of the required criminal intent." Germaine v. State, 718 N.E.2d 1125, 1132 (Ind.Ct.App.1999), trans. denied.[6] M.Q.M. asserts that "there is no reason to believe [he] would not have returned the car" to his parents had his friend not crashed it into a fence. Appellant's Br. at 12. In other words, M.Q.M. argues, and we agree, that the State failed to prove beyond a reasonable doubt that he intended to deprive his parents permanently of the value or use of the car.[7] Consequently, we must vacate the juvenile court's true finding for auto theft.
*447 "Generally, we may order a modification of a conviction to that of a lesser included offense because of the insufficiency of evidence on a particular element of a crime." A.H. v. State, 794 N.E.2d 1147, 1151 (Ind.Ct.App.2003). Because the crime of conversion may be established by proof of less than all the material elements of auto theft, it is an inherently lesser included offense. See Wright, 658 N.E.2d at 566 (defining inherently included offense); id. at 569 ("[T]he relationship between Theft and Criminal Conversion is paradigmatically that of a greater to an inherently lesser included offense."). It is undisputed that M.Q.M. knowingly exerted unauthorized control over his parents' car. We therefore remand to the juvenile court to enter a true finding for conversion, a class A misdemeanor if committed by an adult. Ind.Code § 35-43-4-3(a). In so doing, the juvenile court may revise its dispositional order consistent with this opinion and with applicable law.

II. Placement at Kokomo Academy
M.Q.M. also appeals his placement at the Kokomo Academy. We employ the following standard of review:
The choice of the specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will be reversed if there has been an abuse of that discretion. The juvenile court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.
C.C. v. State, 831 N.E.2d 215, 216-17 (Ind.Ct.App.2005) (citations omitted).[8]
Indiana Code Section 31-37-18-6 sets forth several factors that a trial court must consider when entering a dispositional order:
If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
(1) is:
(A) in the least restrictive (most family like) and most appropriate setting available; and
(B) close to the parents' home, consistent with the best interest and special needs of the child;
(2) least interferes with family autonomy;
(3) is least disruptive of family life;

*448 (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.
In claiming that the juvenile court abused its discretion in placing him at the Kokomo Academy, M.Q.M. relies heavily on the psychological assessment performed by Dr. James A. Cates on April 27, 2005. M.Q.M. selectively quotes several favorable passages from Dr. Cates's report, including the first two of his three recommendations:
1. [M.Q.M.] may benefit from review by a physician for antidepressant medication. It is unclear that his anger and rage stem from depression, but this is one possibility that may be worth exploring.
2. [M.Q.M.] reports benefit from counseling in the community, and has received such counseling in the past. It seems that [M.Q.M.] is most appropriately referred for a combination of individual and group counseling, since many of his issues revolve around his ability to interact effectively with his peer group.
Appellant's App. at 56. We note, however, that M.Q.M. glosses over Dr. Cates's third recommendation, which states:
3. Perhaps the issue of greatest concern is whether [M.Q.M.] can [e]ffectively be treated in the community. This psychological assessment, in and of itself, is not indicative of severe risk. However, when it is considered in conjunction with Dr. Wingard's assessment of one year ago, it suggests an emerging pattern in which [M.Q.M.] threatens self-harm or aggression against others, and when confronted with his behavior, becomes contrite, and explains the "misunderstanding." However, [M.Q.M.] has made threats, allusions to violence, excessive, intimidating references to mass murder or shooting sprees, albeit imagined, intimidating weapons comments, inappropriate communications to peers, expresses anger, and has expressed depression and suicidal thoughts. Together, this combination is considered indicative of adolescents who are at risk for extremely assaultive behaviors, and is likely to suggest a poor prognosis for treatment in the community. For this reason, [M.Q.M.] may be a candidate for residential care.
Id.
In view of Dr. Cates's concerns, which M.Q.M. does not dispute, we cannot say that the juvenile court abused its discretion in placing M.Q.M. at the Kokomo Academy. Obviously, M.Q.M.'s local counseling did not stop the escalation of his antisocial, attention-seeking behavior that culminated in making false statements about possessing cocaine and joyriding in his parents' car. The juvenile court was under no obligation to revisit failed strategies before placing M.Q.M. in a highly structured environment outside his community.[9] We therefore affirm that portion of the dispositional order. See D.J. v. State, 798 N.E.2d 535, 537 (Ind.Ct.App.2003) (affirming placement at Kokomo Academy where juvenile had "problems with aggression" and school attendance/discipline problems), trans. denied (2004).

*449 III. Payment of Fees

Indiana Code Section 31-40-2-1(a) provides that a juvenile court may order a delinquent child or the child's parent to pay an initial and a monthly probation user's fee and an administrative fee, subject to Indiana Code Section 31-40-1-3. Indiana Code Section 31-40-1-3(a) states that a parent of a delinquent child "is financially responsible ... for any services ordered by the court." M.Q.M. asserts, and the State concedes, that the juvenile court improperly ordered him to pay these fees and the docket fee without inquiring as to his or his parents' ability to pay. We therefore order the juvenile court to conduct an indigency hearing on remand. See A.E.B. v. State, 756 N.E.2d 536, 544 (Ind.Ct.App.2001) (remanding for indigency hearing to determine juvenile's ability to pay probation and public defender fees).
Affirmed in part, vacated in part, and remanded.
FRIEDLANDER, J., and MAY, J., concur.
NOTES
[1] Both the State's request for authority to file a delinquency petition and M.Q.M.'s appellate brief refer to the offense as "possession of a look-a-like substance." Appellant's App. at 46; Appellant's Br. at 13. The State's request alleges that the substance was yellow, whereas the high school principal testified that the substance was white. Compare Appellant's App. at 46 with Tr. at 13.
[2] See Ind.Code § 35-48-2-6(b)(4) (listing cocaine as a schedule II controlled substance).
[3] Because Indiana Code Section 35-48-4-4.5(a) is written in the disjunctive, we need not address M.Q.M.'s argument that the State failed to prove that the grits' appearance would lead a reasonable person to believe that they are cocaine.
[4] On appeal, the State addresses only the element of unauthorized control. See Appellee's Br. at 7-9.
[5] The "joyriding" statute, which was repealed in 1976, stated in pertinent part, "A person commits a crime when he ... knowingly obtains or exerts unauthorized control over the vehicle of the owner under circumstances not amounting to theft[.]" Ind.Code § 35-17-5-9; 1963 Ind. Acts (special session)page no. 14.
[6] M.Q.M. asserts that "[w]here the State resorts to circumstantial evidence to prove an essential element of the crime, all reasonable hypotheses of innocence must be excluded." Appellant's Br. at 11 (citing Capps v. State, 258 Ind. 565, 568, 282 N.E.2d 833, 834 (1972)). Our supreme court has explained that "[w]hile a defendant may be entitled to a jury instruction to this effect, this standard is not applicable to appellate review for sufficiency of evidence." Ogle v. State, 698 N.E.2d 1146, 1149 (Ind.1998).
[7] We do not mean to suggest, however, as did M.Q.M.'s trial counsel, that a child cannot commit auto theft of his parents' motor vehicle. See Tr. at 77 ("You can't steal your own parent's automobile.").
[8] We note that M.Q.M. has already served the five-month sentence mandated in the dispositional order. The State does not contend that the issue is moot, and we would address it regardless because of the possibility that M.Q.M. would remain at or be returned to the Kokomo Academy after the December 2005 review hearing and because issues regarding short-term juvenile placements frequently evade appellate review but are likely to recur. See W.R.S. v. State, 759 N.E.2d 1121, 1123 (Ind.Ct.App.2001) (addressing propriety of juvenile's three-month sentence under public interest exception to mootness doctrine), disagreed with on other grounds by R.A. v. State, 770 N.E.2d 376 (Ind.Ct.App.2002). As for the State's argument that M.Q.M. invited any error by requesting placement "where he could actually get some proper counseling and some proper treatment through a clinical psychologist," Tr. at 84, we note that M.Q.M. specifically feared being placed in a facility where his "parents wouldn't be actively involved[.]" Id. at 84. It seems clear that the Kokomo Academy is just such a facility. We therefore reject the State's claim of invited error.
[9] As for M.Q.M.'s assertion that his placement at the Kokomo Academy disrupted his family's pastoral counseling sessions, the pastor himself observed that M.Q.M. "needs a very structured environment, something other than what he is getting at home." Id.