## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 02 2015, 10:50 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Bernice A. N. Corley
Appellate Panel Attorney — Marion
County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Stephen Wilbert,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 2, 2015

Court of Appeals Case No.
49A02-1408-CR-533

Appeal from the Marion Superior
Court
The Honorable Grant W. Hawkins,
Judge
The Honorable Christina Klineman,
Commissioner
Case No. 49G05-1312-FC-78965

**Bradford, Judge.**

# Case Summary

[1]     On the evening of December 11, 2013, Appellant-Defendant Stephen Wilbert

was arrested after he and a group of three others used $1300.00 in counterfeit

United States currency to pay for purchases from an Indianapolis-area Target store. Wilbert was subsequently charged with and found guilty of Class C felony forgery and Class D felony theft. Wilbert challenges the sufficiency of the evidence to sustain his convictions on appeal. He also contends that his convictions violate the constitutional prohibitions against double jeopardy. Concluding that the evidence is sufficient to sustain Wilbert's convictions and that his convictions for Class C felony forgery and Class D felony theft do not violate constitutional prohibitions against double jeopardy, we affirm.

## Facts and Procedural History

At approximately 7:00 p.m. on December 11, 2013, Wilbert went to an Indianapolis-area Target store with D'Andre Driver, Antwain Batemon, and Ryan Mahone. Driver and Batemon first entered the store with Wilbert and Mahone entering a few minutes later. Upon entering the store, Driver and Batemon went to the electronics section. Driver and Batemon quickly selected high-dollar items such as "Beats by Dre" headphones, a television, an Xbox 360, and expensive Lego merchandise. Tr. p. 29.

On December 11, 2013, David Casiano was employed by Target as a senior assets-protection specialist. Casiano had worked for Target for approximately six years, focusing on instances of theft and fraud. During the course of his employment on that evening, Casiano observed Driver and Batemon on the store's surveillance video. Casiano's attention was drawn to Driver and Batemon because of how quickly they were selecting high dollar items from the

"front end cap" of the electronic section, which was unlocked to allow guests easier access to the merchandise. Tr. p. 29. After approximately ten minutes, Driver and Batemon proceeded toward the checkout lane. At this time, Casiano went to the sales floor to observe the transaction from a distance of approximately twenty to thirty feet away while two uniformed security officers continued to watch the transaction on the surveillance video.

[4] Driver and Batemon went through a register that was staffed by Jane Carver. The value of the merchandise selected by Driver and Batemon totaled $932.99. Batemon handed Driver cash which Driver combined with cash from his pocket. Driver then presented the money to Carver as payment. Although Casiano was unable to see the denomination of the currency given to Carver by Driver, Casiano observed that Carver placed the bills in the "farthest right till," where the higher-value bills are stored. Tr. p. 85. After paying for the merchandise, Driver and Batemon left the store.

[5] Seconds later, Casiano walked over to Carver's register. Casiano proceeded to check the bills that Driver and Batemon had given to Carver, including nine $100.00 bills. Casiano knew "right then and there … that there was a problem." Tr. p. 34. Casiano, who had extensive experience identifying counterfeit currency, had encountered large numbers of counterfeit bills at the store every month. Casiano noted that some of the $100.00 bills appeared to have identical serial numbers. He also noted that each of the $100.00 bills had an unusual chemical smell and an identical mark on Benjamin Franklin's face which did not appear on genuine $100.00 bills. Target's policy was to file a

report with the Indianapolis Metropolitan Police Department ("IMPD") if a transaction involving counterfeit currency totaled over $200.00. Casiano took all nine $100.00 bills and printed off a receipt of the transaction. He then notified IMPD. While on the telephone with IMPD, Casiano observed that Driver and Batemon were still in the store parking lot.

[6] Three minutes after Driver and Batemon left the store, and while Casiano was on the telephone with IMPD, Wilbert and Mahone, who had also shopped for a period of approximately ten minutes, approached Carver's checkout lane with a cart full of merchandise. The merchandise was similar in nature to the merchandise selected by Driver and Batemon. After Carver scanned the items, but before either man tendered payment, Mahone left the store. Wilbert followed Mahone outside without paying, leaving the cart and merchandise at the register. Wilbert went to the vehicle where Driver, Batemon, and Mahone were waiting, unlocked the vehicle, and took something from Mahone. Wilbert then re-entered the Target store and went back to Carver's checkout lane to pay for his merchandise.

[7] Casiano, who had followed the men outside, re-entered the store and observed the transaction between Wilbert and Carver from a distance of approximately thirty feet. Casiano observed Wilbert remove money from his wallet and hand it to Carver, who again placed the bills in the right-most till. Wilbert then exited the store with the merchandise. As soon as Wilbert exited the store, Casiano approached Carver's register. He removed four new $100.00 bills that had not been in the register before Wilbert completed his transaction. The

$100.00 bills bore the same flaws as the nine $100.00 bills Casiano had removed from the register after Driver and Batemon's transaction. No other cash transactions had occurred at Carver's register between the time Driver and Batemon completed their transaction and Wilbert completed his transaction.

[8] IMPD Officer Curt Collins, who had responded to Casiano's report of forgery and theft, stopped Wilbert before he rejoined Driver, Batemon, and Mahone. Officer Collins spoke to Casiano, who showed him the thirteen $100.00 bills that he had retrieved from Carver's register. Officer Collins detained the four men and contacted the United States Secret Service ("Secret Service") to report the recovery of the counterfeit currency.

[9] Secret Service Special Agent Darren Brock had been investigating incidents involving these particular flawed, counterfeit $100.00 bills since they started appearing in Indianapolis in November of 2013. In light of his experience with these particular counterfeit bills, Special Agent Brock responded to the reported recovery of counterfeit currency. Special Agent Brock determined that the bills in question were counterfeit because they all had the identical small flaw on the portrait of Benjamin Franklin's face, the paper texture was "a little bit off," and there was no color shifting ink present on any of the bills. Tr. p. 142.

[10] Special Agent Brock questioned the four men individually inside the store's loss-prevention office. After the interviews were complete, Officer Collins arrested all four of the men. During a search incident to their arrests, Officer Collins recovered two additional counterfeit $100.00 bills that were in

Batemon's possession, one additional counterfeit $100.00 bill that was in Driver's possession, and one additional counterfeit $100.00 bill that was in Wilbert's possession. These counterfeit $100.00 bills bore identical flaws to those used by the men in completing their earlier Target transactions.

[11] On December 16, 2013, Appellee-Plaintiff the State of Indiana (the "State") charged Wilbert with Class C felony forgery, Class D felony theft, and Class D felony counterfeiting. Wilbert subsequently waived his right to a jury trial. The trial court conducted a bench trial on May 29, 2014.

[12] During trial, Special Agent Brock testified that, as of the date of trial, the Secret Service had recovered "somewhere in the neighborhood of $300,000[.00]" worth of counterfeit $100.00 bills bearing the same flaws as the counterfeit $100.00 bills in question. Tr. p. 149. Special Agent Brock also testified that "[t]here is a lot of information on [the Secret Service] public website that can help someone determine what is counterfeit and what is not." Tr. p. 146. Special Agent Brock further testified about how individuals can profit from using counterfeit currency and certain tendencies or patterns individuals using counterfeit currency commonly exhibit. In addition, the trial court took notice that the counterfeit $100.00 bills in question had a different texture than genuine $100.00 bills and lacked a watermark and safety strip.

[13] Following the conclusion of the State's presentation of evidence, Wilbert moved for judgment on the evidence. The trial court denied Wilbert's motion.

After the conclusion of the presentation of the evidence, the trial court found Wilbert guilty as charged.

[14] The trial court subsequently conducted a sentencing hearing, during which it merged Wilbert's Class D felony counterfeiting conviction into Wilbert's Class C felony forgery conviction. With respect to the Class C felony forgery conviction, the trial court sentenced Wilbert to 1095 days with seven days executed, 1088 days suspended, and two years on probation. With respect to the Class D felony theft conviction, the trial court sentenced Wilbert to 365 days, all suspended and two years on probation. The trial court ordered that the sentences be served concurrent with one another, and granted Wilbert seven days of credit time. This appeal follows.

# Discussion and Decision

## I. Sufficiency of the Evidence

[15] Wilbert contends that the evidence is insufficient to sustain his convictions for Class C felony forgery and Class D felony theft.

## A. Standard of Review

[16] When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the

conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

## B. Forgery

In charging Wilbert with Class C felony forgery, the State alleged that Wilbert:

> on or about December 11, 2013, did, with intent to defraud, utter to Jane Carver a written instrument, that is: United States $100.00 treasury bills, in such a manner that said instrument purported to have been made by the authority of the United States Department of Treasury [("Department of Treasury")], who did not give authority[.]

Appellant's App. p. 21. The offense of forgery is governed by Indiana Code 35-43-5-2, which, on the date in question, read as follows: "(b) A person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made: (1) by another person; (2) at another time; (3) with different provisions; or (4) by authority of one who did not give authority; commits forgery, a Class C felony." Thus, in order to prove that

Wilbert committed Class C felony forgery, the State had to prove that: on or about December 11, 2013, Wilbert, acting with the intent to defraud, uttered to Carver, United States currency, *i.e.*, $100.00 bills, which Wilbert purported to have been made by the authority of the Department of Treasury, which did not give such authority.

[18] Wilbert does not dispute that the counterfeit $100.00 bills were not made by or authorized to be made by the Department of Treasury. Rather, in challenging the sufficiency of the evidence to sustain his forgery conviction, Wilbert argues that the State failed to prove that he "uttered" the written instrument in question, *i.e.*, the counterfeit currency or, alternatively, that he did so with the intent to defraud. The State, for its part, argues that the evidence is sufficient to prove that Wilbert uttered the counterfeit currency to Carver and that he did so with the intent to defraud.

[19] As used in Indiana Code 35-43-5-2(b), the term "utter" is defined as "to issue, authenticate, transfer, publish, deliver, sell, transmit, present, or use." The evidence demonstrates that at approximately 7:00 p.m. on December 11, 2013, Wilbert arrived at the Target store with Driver, Batemon, and Mahone. Approximately ten minutes after arriving at the store, Driver and Batemon went through a checkout lane staffed by Carver and purchased $932.99 worth of high-dollar merchandise using nine counterfeit $100.00 bills. Immediately after Driver and Batemon completed their transaction, Casiano removed the counterfeit bills from Carver's register. Approximately three minutes after Driver and Batemon completed their transaction, Wilbert entered Carver's

checkout lane and purchased similar high dollar merchandise and a basketball. Casiano observed Wilbert hand Carver currency.

[20] Although Casiano, who was standing approximately twenty to thirty feet away, was not able to see the exact denomination of the currency exchanged between Carver and Wilbert, security video demonstrates that Carver placed the currency in the farthest-right till, where higher-value bills are stored. Casiano immediately approached Carver's register and removed four additional counterfeit $100.00 bills from the farthest-right till. Casiano testified that these bills had not been in the till when he removed the counterfeit bills tendered minutes earlier by Driver, and there had been no other cash transactions in Carver's checkout lane in the intervening three minutes between the time that Driver and Wilbert went through the checkout lane.

[21] Wilbert also argues that the State failed to prove that he "uttered" the counterfeit currency with the intent to defraud.

> Proof of intent to defraud requires a showing the defendant demonstrated "intent to deceive and thereby work a reliance *and injury.*" *Wendling v. State*, 465 N.E.2d 169, 170 (Ind. 1984) (emphasis added). Actual injury is not required; potential injury is enough. *See Diallo v. State*, 928 N.E.2d 250, 252 (Ind. Ct. App. 2010) ("[T]here must be a *potential* benefit to the maker or potential injury to the defrauded party") (quoting *Jacobs v. State*, 640 N.E.2d 61, 65 (Ind. Ct. App. 1994) (emphasis added)).

*Bocanegra v. State*, 969 N.E.2d 1026, 1028 (Ind. Ct. App. 2012) (emphases in original). "Intent to defraud may be proven by circumstantial evidence which will often include the general conduct of the defendant when presenting the

instrument for acceptance." *Miller v. State*, 693 N.E.2d 602, 604 (Ind. Ct. App. 1998) (citing *Wendling*, 465 N.E.2d at 170). "Because intent is a mental state, the fact-finder often must 'resort to the reasonable inferences based upon an examination of the surrounding circumstances to determine' whether—from the person's conduct and the natural consequences therefrom—there is a showing or inference of the requisite criminal intent." *Diallo*, 928 N.E.2d at 253 (quoting *M.Q.M. v. State*, 840 N.E.2d 441, 446 (Ind. Ct. App. 2006)). Further, although knowledge of the falsity of a written instrument is not a separate essential element of the crime of forgery, such knowledge may be relevant to show intent to defraud. *Benefield v. State*, 904 N.E.2d 239, 245 (Ind. Ct. App. 2009) (citing *Wendling*, 465 N.E.2d at 170), *trans. denied*.

[22] Special Agent Brock testified that one way individuals profit from using counterfeit currency is to purchase something from a store, such as Target, with the counterfeit currency and then return the item to another store location. Special Agent Brock further testified that these individuals seem to exhibit certain tendencies or patterns when shopping with the counterfeit currency. Specifically, Special Agent Brock explained that:

> when you're going to take something back to a secondary store, it doesn't really matter what that item is. There's not going to be, not going to spend hours shopping as we normally would to find the best price or the best deal. People can simply go in and pick up large ticket items and buy them immediately without having to shop or, or waste time trying to make a decision because it doesn't matter what those items are. You're just going to take it back and receive currency. Secondly, we, we've found that when there are groups of people that tend to do this, they tend to use the same register in one of two

scenarios. One, you have a complicit register clerk and the people that are using counterfeit will go to that one person that they know or have a relationship with or know will accept the currency and they'll purchase things from that aisle. Or when one person is known, whether they're complicit or not, that they will accept the money, other people will use that aisle as well because they know that person just looked at the counterfeit and didn't determine it as counterfeit. So why take a chance on somebody else determining it's counterfeit.

Tr. p. 157.

[23] Again, the evidence shows that, on the date in question, Wilbert acted in accordance with the behavior described by Special Agent Brock. Upon arriving at the Target store, Driver and Batemon quickly filled their cart with over $900.00 worth of high-dollar items. Driver and Batemon went through Carver's checkout lane and used nine counterfeit $100.00 bills to pay for their purchases. Similarly, Wilbert and Mahone quickly filled their cart with approximately $400.00 worth of high-dollar electronics and a basketball. Approximately three minutes after Driver and Batemon had gone through Carver's line and successfully used the counterfeit $100.00 bills, Mahone left the store and Wilbert went through Carver's line at the checkout and used four counterfeit $100.00 bills to pay for his purchases.

[24] The counterfeit bills that were tendered to Carver bore the same flaws as the counterfeit bills that were recovered from Batemon's, Driver's, and Wilbert's persons following their arrests. Specifically, the counterfeit bills each had a defect on the left side of Benjamin Franklin's which made them "very distinguishable." Tr. p. 116. The counterfeit bills also lacked color shifting ink

and had a chemical smell to them that was "a bit unusual." Tr. p. 75. In addition, the paper texture of each of the counterfeit bills was "a little bit off." Tr. p. 142. Batemon testified that Wilbert gave him the two counterfeit $100.00 bills that were found in his possession following his arrest the night before the men went to Target together. Driver testified that he won the counterfeit $100.00 bills during a "dice" game that he played the night before with Wilbert, Juan Carlton, and other men. Tr. p. 197.

[25] Special Agent Brock also testified that there is "a lot" of information available on the Secret Service's public website that is intended to help someone determine what is counterfeit and what is not. Tr. p. 146. Considering the totality of the evidence, including (1) the noticeable differences between the counterfeit $100.00 bills and genuine $100.00 bills, (2) Special Agent Brock's testimony regarding the tendencies of people attempting to shop with counterfeit currency and the availability of information available to the public regarding how to identify counterfeit bills, and (3) Wilbert's actions, we conclude that the trial court could reasonably infer that Wilbert knew the $100.00 bills were counterfeit when he tendered the bills to Carver. Again, Wilbert's inferred knowledge is relevant to the question of whether Wilbert acted with the intent to defraud. *See Benefield*, 904 N.E.2d at 245.

[26] In light of the above-discussed evidence, we conclude that it was reasonable for the trial court to infer that Wilbert "uttered" the counterfeit bills to Carver. We also conclude that, in light of the totality of the circumstances, it was reasonable for the trial court to infer that Wilbert did so with the intent to defraud. As

such, we conclude that the evidence is sufficient to sustain Wilbert's forgery conviction. Wilbert's claim to the contrary amounts to a request for this court to reweigh the evidence, which, again, we will not do. *See Stewart*, 768 N.E.2d at 435.

## C. Theft

In charging Wilbert with Class D felony theft, the State alleged that Wilbert "on or about December 11, 2013, did knowingly exert unauthorized control over the property, that is: electronic equipment and/or toys, of Target, with [the] intent to deprive Target of any part of the value or use of said property[.]" Appellant's App. p. 21. The offense of theft is governed by Indiana Code 35-43-4-2, which, on the date in question, read as follows: "(a) A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." Thus, in order to prove that Wilbert committed Class D felony theft, the State had to prove that: on or about December 11, 2013, Wilbert knowingly or intentionally exerted unauthorized control over electronics and/or toys which belonged to Target with the intent to deprive Target of the value or use of said merchandise.

In challenging the sufficiency of the evidence to sustain his Class D felony theft conviction, Wilbert argues that because the evidence demonstrates that he paid for the items in question at the checkout and there is no evidence that he intended to "utter" counterfeit currency, he could not have possessed the requisite intent to exert unauthorized control over the merchandise.

Alternatively, Wilbert argues that Target, by Casiano, consented to his control over the merchandise because Casiano was suspicious that Wilbert might be using counterfeit currency to pay for the merchandise in question but nonetheless allowed Wilbert to complete his transaction. For its part, the State argues that the evidence demonstrates that Wilbert intended to "utter" counterfeit currency when purchasing the merchandise. The State also argues that Target did not consent to Wilbert's control over the merchandise.

[29] Again, for the reasons discussed above, based on the totality of the circumstances, it was reasonable for the trial court to infer that Wilbert knew the $100.00 bills in question were counterfeit when he tendered the counterfeit bills to Carver. It reasonably follows, therefore, that the trial court could reasonably infer that Wilbert knew that the counterfeit $100.00 bills could not be used as genuine payment for merchandise. The facts and reasonable inferences that flow therefrom are sufficient to sustain the trial court's determination that Wilbert knowingly exerted unauthorized control over the merchandise in question.

[30] In addition, Wilbert claims that Target consented to his taking the merchandise because Casiano did not act on his suspicions and stop Wilbert from completing his purchase using the counterfeit currency. In raising this claim, Wilbert relies on our opinion in *Miller v. State*, 693 N.E.2d 602 (Ind. Ct. App. 1998). We note, however, that Wilbert's reliance on *Miller* appears to be misplaced. In *Miller*, the defendant was convicted of forgery and theft after he entered into a cellular service agreement under a false name, Ralph Thompson,

Jr., and issued a $900.00 check, which was purported to be drawn on Thompson's account, as a deposit. 693 N.E.2d at 604. In addition, before relinquishing the phones to the defendant, the cellular company ran a credit check on Thompson's name. *Id.* at 604-05. The cellular company, however, never received the $900.00 because of insufficient funds in the Thompson checking account, which never held more than $49.00. *Id.* at 605. Given these facts, we concluded that the jury could have reasonably inferred that the defendant's use of a false name in order to obtain the phones resulted in his control over them being unauthorized. *Id.* at 605. We further concluded that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant had committed theft. *Id.*

[31]  Upon review, we agree with the State's claim that the facts in the instant matter require the same result. Although Casiano may have been suspicious of Wilbert before Wilbert completed his transaction, Casiano did not know that Wilbert had used counterfeit currency as payment for the merchandise at issue until *after* Wilbert had completed his transaction. Casiano's actions immediately after confirming that Wilbert had in fact tendered counterfeit currency as payment for his purchases—approaching Wilbert and notifying the police—indicates that Target did not consent to Wilbert taking control of the merchandise in question. Further, Casiano specifically testified that Target did not consent to Wilbert taking the merchandise in question from the store without first providing genuine payment. As such, we conclude that Target's consent, to the extent given, was limited only to a situation where Wilbert paid

for the merchandise with genuine currency and cannot reasonably be extended to include payment with counterfeit currency. Accordingly, we further conclude that the evidence is sufficient to sustain Wilbert's Class D felony theft conviction. Wilbert's claim to the contrary again amounts to a request for this court to reweigh the evidence, which we will not do. *See Stewart*, 768 N.E.2d at 435.

# II. Double Jeopardy

Wilbert also contends that his convictions for both Class C felony forgery and Class D felony theft violate the constitutional prohibitions against double jeopardy.

> The Indiana Double Jeopardy Clause provides, "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. I, § 14. We analyze alleged violations of this clause pursuant to our Supreme Court's opinion in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999). In *Richardson*, our Supreme Court held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original).

*Bunch v. State*, 937 N.E.2d 839, 845 (Ind. Ct. App. 2010).

## A. Statutory Elements

Two or more offenses are the same offense in violation of Article I, Section 14 of the Indiana Constitution if the essential statutory elements of one of the

challenged offenses also establishes the essential statutory elements of another challenged offense. *See Bunch*, 937 N.E.2d at 845 (citing *Richardson*, 717 N.E.2d at 49). We have previously concluded that the essential statutory elements of the crimes of forgery and theft do not create a double jeopardy issue. *See Williams v. State*, 892 N.E.2d 666, 669 (Ind. Ct. App. 2008) (citing *Benberry v. State*, 742 N.E.2d 532, 537 (Ind. Ct. App. 2001)), *trans. denied*. Wilbert does not provide any authority stating otherwise or present an argument as to why the essential statutory elements of forgery and theft should be found to create a double jeopardy issue. In light of our prior conclusions in *Williams* and *Benberry*, we conclude that Wilbert's conviction for each of these crimes does not violate the statutory elements test set forth in *Richardson*.

## B. Actual Evidence

[34] Under the "actual evidence" test, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish all of the essential elements of a second challenged offense. *Bunch*, 937 N.E.2d at 845 (citing *Richardson*, 717 N.E.2d at 53). Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the fact-finder's perspective. *Id*. at 845-46. The term "reasonable possibility" "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id*. at 846.

> The language expressing the actual evidence test explicitly requires evaluation of whether the evidentiary facts used to establish the essential elements of one offense may also have been used to establish *the essential elements* of a second challenged offense. The test is not merely whether the evidentiary facts used to establish *one* of the essential elements of one offense may also have been used to establish *one* of the essential elements of a second challenged offense. In other words, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Spivey v. State*, 761 N.E.2d 831, 832-33 (Ind. 2002) (emphases in original).

[35] Again, in order to prove that Wilbert committed Class C felony forgery, the State presented evidence demonstrating that Wilbert, with the intent to defraud, uttered four counterfeit $100.00 bills to Carver. Specifically, the State presented evidence demonstrating the following: approximately three minutes after Driver and Batemon had gone through Carver's checkout lane and used nine counterfeit $100.00 bills to purchase certain high-dollar items, Wilbert went through Carver's checkout lane and used four counterfeit bills to purchase similar high-dollar items. All of the men had quickly selected the merchandise in question without first studying the merchandise and had acted in accordance with known tendencies of individuals who were attempting to "purchase" merchandise with counterfeit currency. In addition, the counterfeit $100.00 bills uttered by Wilbert, Driver, and Batemon bore the same flaws as the counterfeit bills recovered from their persons following their arrests. These flaws included a "very distinguishable" defect on Benjamin Franklin's chin, tr. p. 116, the lack of color shifting ink, a chemical smell that was "a bit unusual,"

tr. p. 75, and a texture to the paper that was "a little bit off." Tr. p. 142. We concluded above that this evidence was sufficient to prove that Wilbert, acting with the intent to defraud, uttered the counterfeit currency to Carver.

[36] In order to prove that Wilbert committed Class D felony theft, the State presented evidence demonstrating that Wilbert knowingly exerted unauthorized control over merchandise belonging to Target with the intent to deprive Target of the merchandise's use or value. Specifically, the State presented evidence that demonstrated that Wilbert knew the counterfeit $100.00 bills could not be used as genuine payment for the merchandise in question but nevertheless "paid" for the merchandise with the counterfeit $100.00 bills and removed the merchandise in question from the Target store. The State also presented evidence that Target had not consented to Wilbert taking the merchandise in question from the store without first providing genuine payment.

[37] In addition, we believe that Wilbert's reliance on our opinion in *Williams* is misplaced because the facts and circumstances presented in the instant matter are easily distinguishable from those presented in *Williams*. In *Williams*, the defendant was charged with and convicted of forgery and attempted theft after she presented a stolen and fraudulent check to the bank for deposit into her account. 892 N.E.2d at 667-68. Both the charged forgery and attempted theft counts alleged culpability and sought punishment for defendant's attempt to take $1050.00 from the bank by passing a fraudulent check. *Id*. at 668. The State's exclusive evidence for both charged offenses was the fact that defendant had the fraudulent check and attempted to deposit it into her account. *Id*. at

669.  As such, we concluded that there was "more than 'a reasonable possibility' that the evidentiary facts used by the State to establish all of the essential elements of one offense were also used to establish all of the essential elements of the other offense[.]"  *Id.*

[38]  Here, unlike in *Williams*, we cannot say that there is "more than a reasonable possibility" that the same facts were used to prove all of the essential elements of both of the charged offenses.  Specifically, the facts establishing the essential elements of the forgery charge, *i.e.*, Wilbert's utterance of the counterfeit $100.00 bills with the intent to defraud, did not establish all of the essential elements of his theft charge.  An essential element of the theft charge, *i.e.*, the exertion of unauthorized control over another, was not complete until Wilbert removed the merchandise in question from the Target store without first providing valid payment.  The State relied on different evidence to prove this essential element than it did to prove any of the essential elements of forgery.

[39]  Upon review, we conclude that the State presented distinct evidence to prove each of the charged offenses.  Furthermore, even to the extent that the State relied on the same evidence to establish some of the essential elements of the charged offenses, the State did not rely on the same evidence to establish *all* of the essential elements of each of the charged offenses.  As such, we conclude that Wilbert has failed to demonstrate that there is a reasonable possibility that the trial court latched on to exactly the same facts for each of the challenged convictions.  *See Spivey*, 761 N.E.2d at 832-33.

The judgment of the trial court is affirmed.

Najam, J., and Mathias, J., concur.